SHAWN PATRICK KNIGHT, EMPLOYEE, PLAINTIFF v. WAL-MART STORES, INC., EMPLOYER; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, CARRIER; DEFENDANTS

No. COA01-108

(Filed 5 March 2002)

**1. Workers' Compensation— disability—findings—sufficient**

The findings of the Industrial Commission in a workers' compensation case supported the conclusion that plaintiff is disabled; medical testimony that a plaintiff suffers from severe pain from a physical injury, combined with the plaintiff's own credible testimony that his pain is so severe that he is unable to work, may be sufficient to support a conclusion of total disability.

**2. Workers' Compensation— disability—evidence considered**

The record in a workers' compensation case does not indicate that the Industrial Commission failed to consider evidence that plaintiff was not disabled where it is likely that the Commission recognized that the evidence cited by defendants does not necessarily conflict with the conclusion that plaintiff is unable to work due to pain.

**3. Workers' Compensation— maximum medical improvement—significance**

Any error by the Industrial Commission in a workers' compensation case concerning maximum medical improvement (MMI) was immaterial where plaintiff had established a total loss of wage earning capacity pursuant to N.C.G.S. § 97-29, did not

KNIGHT v. WAL-MART STORES, INC.

[149 N.C. App. 1 (2002)]

seek benefits pursuant to N.C.G.S. § 97-31, and did not seek to establish that his total loss of wage earning capacity is permanent. The primary significance of MMI is to delineate when the healing period ends and the statutory period begins in cases involving an employee who may be entitled to benefits for a physical impairment listed in N.C.G.S. § 97-31 and does not represent the point in time at which a loss of wage-earning capacity under N.C.G.S. § 97-29 or N.C.G.S. § 97-30 automatically converts from temporary to permanent.

**4. Workers' Compensation— withdrawal from pain medications—detoxification program**

An Industrial Commission finding in a workers' compensation action regarding plaintiff's withdrawal from pain medications and entry into a detoxification program was supported by competent evidence where plaintiff testified that his doctor prescribed heavy narcotic pain medicines over a 6-month period, that the doctor decided against a refill because plaintiff was taking too much, that plaintiff abruptly discontinued the medicines and experienced withdrawal symptoms, and that he entered a detoxification program as a result.

**5. Workers' Compensation— costs—mediated settlement conference**

The Industrial Commission did not err in a workers' compensation action by ordering defendants to pay costs, including those of a mediated settlement conference.

Judge BRYANT dissenting in part.

Appeal by defendants from an Opinion and Award entered 14 July 2000 by the North Carolina Industrial Commission. Heard in the Court of Appeals 29 November 2001.

*Poisson, Poisson, Bower & Clodfelter, by Fred D. Poisson, Jr., for plaintiff-appellee.*

*Young Moore and Henderson, P.A., by Joe S. Austin, Jr. and Zachary C. Bolen, for defendant-appellants.*

HUNTER, Judge.

Wal-Mart Stores, Inc. ("Wal-Mart") and the Insurance Company of the State of Pennsylvania (together "defendants") appeal from an

**KNIGHT v. WAL-MART STORES, INC.**

[149 N.C. App. 1 (2002)]

opinion and award entered by the North Carolina Industrial Commission ("the Commission") awarding Shawn Patrick Knight ("plaintiff") disability benefits. We affirm.

The evidence presented at the hearing tended to establish the following facts. Plaintiff has a history of back injuries, beginning with an injury at work in August of 1990 which caused him to experience pain running down his left leg and which resulted in surgery in 1991 to repair a ruptured disk. In 1993, plaintiff experienced a minor injury to his back. Plaintiff testified that his back bothered him occasionally between 1993 and the accident in 1998.

In 1998, plaintiff was employed by Wal-Mart stocking freight at night, and his job required him, among other tasks, to lift goods and place them on shelves. On 15 March 1998, plaintiff's supervisor directed plaintiff to remove some computers from the top riser. Plaintiff climbed to the top of an eight-foot stepladder, picked up a computer, and started climbing down. When he reached the second-to-last rung, the computer started to fall. He attempted to step down to the last rung, but he missed the rung and fell to the floor. Plaintiff felt something "pop" or "jerk" in his back as he fell, and he landed on his hip. Plaintiff tried to walk around but felt pain running down his left leg. He reported the accident to his supervisor and his supervisor filled out an accident report. After plaintiff indicated that he might need medical attention, a co-employee drove him to the hospital. At the hospital, plaintiff was diagnosed with broad-based disk protrusion. Plaintiff received some painkillers and then returned to work later that night.

Plaintiff returned to work on a few occasions during the next week, including 21 March (for six hours), 22 March (for eight hours), and 24 March (for eight hours). During this time he continued to feel pain in his lower back and running down his left thigh. Following 24 March 1998, plaintiff stopped working due to "pain" and "discomfort."

Dr. Joseph King, an orthopaedic surgeon, first saw plaintiff on 9 April 1998. Dr. King opined that plaintiff "had continued pain in that left leg radiating all the way down the leg and that was quite consistent throughout the course of his treatment." Dr. King opined that the accident at Wal-Mart could have aggravated or accelerated plaintiff's pre-existing back problems. On 30 April, Dr. King saw plaintiff again and noted that he continued to suffer significant pain. Dr. King prescribed a pain medication for plaintiff at that time.

Plaintiff returned to work on 21 May 1998, during which time he sat on a stool in the electronics department and did nothing. Plaintiff testified that this was not a job that any employees normally perform at Wal-Mart. Tracy Stillwell, the store manager, provided testimony corroborating these facts. After a while, plaintiff began to experience significant discomfort and pain in his lower back and leg from sitting, and as a result of this pain plaintiff left work after a few hours. After 21 May, Wal-Mart offered plaintiff a light duty position shelving some "returns" at night, and plaintiff tried this work two or three times but was unable to remain at work due to pain.

Dr. King performed a laminectomy on plaintiff on 22 July 1998. Plaintiff chose to have the surgery, despite the risks, because he "didn't see any alternative to relieving the pain." However, plaintiff testified that he did not experience any relief from the surgery.

Plaintiff again worked on 7 September (four hours), 3 November (eight hours), and 4 November (five hours). In January of 1999, Wal-Mart offered plaintiff light duty work as a sweeper, or greeter, or stock return person. Plaintiff told Wal-Mart that he did not feel he was able to return to work due to his pain. Plaintiff testified that he tried to sweep at home and was only able to sweep for fifteen to thirty minutes. On other occasions plaintiff attempted to work as a return clerk, but was unable to work due to pain in his lower back and left leg.

Dr. King saw plaintiff again on 4 January 1999, at which time plaintiff was still suffering from pain. At that time, Dr. King concluded that plaintiff had improved as much as he was likely to improve. In addition, Dr. King found that plaintiff's left ankle reflex was not present (which, he explained, means that the nerve is not functioning properly). Dr. King stated that this finding suggests "objective nerve damage," meaning "[s]omething that [plaintiff] has no control over." He testified that because plaintiff's reflexes were normal in July of 1998, the finding further suggests that "there may have been some different pressure on that nerve," and that such pressure upon a nerve is connected to pain. Dr. King testified that plaintiff's complaints of burning and pain down into his thigh area, and numbness in his left foot, are consistent with Dr. King's findings.

On 4 January 1999, and on various other occasions during Dr. King's treatment of plaintiff, he gave plaintiff "return-to-work" slips containing various restrictions on how much weight plaintiff should lift. Dr. King testified that the purpose of giving plaintiff return-to-work slips was to help plaintiff return to gainful employment in order

KNIGHT v. WAL-MART STORES, INC.

[149 N.C. App. 1 (2002)]

to see whether the pain would prevent him from working. He also explained that, in his opinion, the return-to-work slips and the restrictions were unrelated to whether plaintiff's pain would prevent him from working.

Dr. King further testified that there is no objective medical reason that plaintiff cannot return to work with certain lifting restrictions, and that plaintiff's complaints of pain are more severe than one would normally expect given plaintiff's physical status. However, Dr. King also testified that the type of injury plaintiff has can be very painful, that sitting can cause the pain to become much worse, and that, in his opinion, plaintiff's complaints of significant pain are genuine.

Dr. King also testified that plaintiff has reached a point of maximum medical improvement ("MMI"), and that, although identifying the date at which plaintiff reached MMI is difficult (because plaintiff has never shown *any* improvement since the injury), he would suggest 4 January 1999 as the date at which he became convinced that plaintiff would not further improve. In addition, Dr. King assigned a disability rating of fifteen percent to plaintiff's back.

At the time of the hearing on 26 January 1999, plaintiff was experiencing numbness in his left foot, as well as pain in his lower back and his left leg. Plaintiff was not taking any pain medication because Dr. King had refused to refill his prescription. Plaintiff testified that although Wal-Mart has paid for plaintiff's medical bills, prescription bills, and for his visits to Carolina Bone and Joint, Wal-Mart has never offered plaintiff any vocational rehabilitation services. Further, plaintiff testified that he has not pursued vocational rehabilitation because he does not believe he is fit to return to work.

In its Opinion and Award, the Commission first noted that "[a]t the hearing before the Full Commission, the parties orally stipulated that compensation awarded herein would terminate as of 11 May 1999, and that compensation after that date shall be determined by agreement of the parties or by Order of the Industrial Commission." The Commission then set forth findings of fact consistent with the facts set forth above, including the following pertinent findings of fact:

> 11. Dr. King stated that plaintiff's pain complaints were consistent with his injury and that he has no doubt that plaintiff has been truthful about his pain. Dr. King further opined that plaintiff's fall off of the ladder on 16 March 1998, could have aggra-

vated or accelerated any existing back pain or back injury that plaintiff may have had on 16 March 1998.

. . .

14. . . . Having weighed the testimony of both parties, the Deputy Commissioner gave more weight to the testimony of plaintiff, and the Full Commission adopts that determination.

The Commission also entered the following pertinent conclusions of law:

1. Plaintiff sustained a compensable injury by accident to his back arising out of and in the course of his employment with defendant-employer and as a direct result of a specific traumatic incident of the work assigned on 16 March 1998, which aggravated, exacerbated and/or accelerated an underlying pre-existing back condition.

. . .

3. Plaintiff is entitled to workers' compensation benefits in the amount of $149.10 per week beginning 16 March 1998, and continuing until 11 May 1999. . . .

We note that, although it is not expressly stated in the Opinion and Award, it is clear from the context that the Commission's award of compensation was made pursuant to the conclusion that plaintiff has suffered a total loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29 (1999).

On appeal, defendants have set forth seventeen assignments of error in the record. Six of these assignments of error are not set out in defendants' brief and are, therefore, deemed abandoned. *See* N.C.R. App. P. 28(b)(5). Defendants have condensed the remaining eleven assignments of error into five arguments for our review.

I.

[1] By their first argument, defendants contend that the Commission's findings of fact do not support its conclusion that plaintiff is disabled. Defendants essentially contend that, although there is competent evidence that plaintiff suffers from a painful physical infirmity, plaintiff has failed to provide evidence establishing a diminished capacity to earn wages. Therefore, defendants argue, although the findings may be supported by the evidence,

they are insufficient to support the legal conclusion of a disability. We disagree.

The Industrial Commission's conclusions of law are fully reviewable by the appellate courts. *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 595, 290 S.E.2d 682, 684 (1982). " 'In order to obtain compensation under the Workers' Compensation Act, the claimant has the burden of proving the existence of his disability and its extent.' " *Saums v. Raleigh Community Hospital*, 346 N.C. 760, 763, 487 S.E.2d 746, 749 (1997) (quoting *Hendrix v. Linn-Corriher Corp.*, 317 N.C. 179, 185, 345 S.E.2d 374, 378 (1986)). "Under the Workers' Compensation Act, disability is defined by a diminished capacity to earn wages, not by physical infirmity." *Id.* at 764, 487 S.E.2d at 750 (citing N.C. Gen. Stat. § 97-2(9) (1991)). Thus, the employee has the burden "to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment." *Russell v. Lowes Product Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (citing *Hilliard*, 305 N.C. at 595, 290 S.E.2d at 684).

> The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.

*Id.* (citations omitted). Under the facts in the present case, it is clear that plaintiff has not attempted to establish disability by means of the second, third, or fourth methods outlined by this Court in *Russell*. Thus, plaintiff had the burden of producing "medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment." *Id.* We believe plaintiff has produced such evidence, and that the Commission's findings of fact, based upon this evidence, support the conclusion of disability.

"In determining if plaintiff has met this burden [of establishing a loss of wage-earning capacity], the Commission must consider not only the plaintiff's physical limitations, but also his testimony as to

his pain in determining the extent of incapacity to work and earn wages such pain might cause." *Webb v. Power Circuit, Inc.*, 141 N.C. App. 507, 512, 540 S.E.2d 790, 793 (2000), *cert. denied*, 353 N.C. 398, 548 S.E.2d 159 (2001). Moreover, medical evidence that a plaintiff suffers from genuine pain as a result of a physical injury, combined with the plaintiff's own credible testimony that his pain is so severe that he is unable to work, may be sufficient to support a conclusion of total disability by the Commission. *See Webb*, 141 N.C. App. 507, 540 S.E.2d 790; *Barber v. Going West Transp., Inc.*, 134 N.C. App. 428, 517 S.E.2d 914 (1999); *Matthews v. Petroleum Tank Service, Inc.*, 108 N.C. App. 259, 423 S.E.2d 532 (1992).[1]

Here, Dr. King testified that plaintiff continues to suffer from genuine pain due to his back injury. In addition, plaintiff testified that the pain in his lower back and left leg is so severe that, not only is he unable to work in any employment, he is often unable to undertake even simple chores, such as sweeping, for more than thirty minutes. Such testimony constitutes "competent evidence as to [plaintiff's] ability to work." *Niple v. Seawell Realty & Insurance Co.*, 88 N.C. App. 136, 139, 362 S.E.2d 572, 574 (1987), *disc. review denied*, 321 N.C. 744, 365 S.E.2d 903 (1988). The Commission determined that plaintiff's testimony was credible and accorded this testimony significant weight. *See Matthews*, 108 N.C. App. at 264, 423 S.E.2d at 535 (holding that Commission is sole judge of credibility of witnesses and weight to be given their testimony, and its determination of these issues is conclusive on appeal). The Commission entered findings consistent with this evidence, and these findings, in turn, support the legal conclusion that plaintiff is disabled. Thus, we reject defendants' first argument.

## II.

[2] By their second argument, defendants contend that the Commission failed to give adequate consideration to certain competent evidence tending to show that plaintiff is not disabled. Specifically, defendants argue that the Commission failed to consider evidence that plaintiff had not taken any steps to find employment since the date of injury, and also that plaintiff had, on certain occasions, declined Wal-Mart's offers to allow plaintiff to work as a safety-

---

1. We note that this case involves an initial determination of disability pursuant to N.C. Gen. Stat. § 97-29, and should therefore be distinguished from our opinion in *Shingleton v. Kobacker Group*, 148 N.C. App. 667, 559 S.E.2d 277 (2002), which involves a plaintiff seeking to establish "a change in condition" pursuant to N.C. Gen. Stat. § 97-47 (1999).

monitor or a greeter. However, because plaintiff established disability by means of the first method outlined in *Russell* (showing that he is incapable of earning wages in any employment), and not by means of the second method (showing that he is capable of some work but has been unable to obtain employment), this evidence was not relevant to the Commission's ultimate determination.

Defendants also contend that the Commission failed to consider that Dr. King gave plaintiff "return-to-work" slips on various occasions. However, a close reading of Dr. King's testimony reveals that his reason for giving plaintiff return-to-work slips was to encourage plaintiff to attempt to return to work in order to see whether the pain would prevent him from working, and that, in Dr. King's opinion, his giving plaintiff return-to-work slips did not represent any medical opinion as to whether plaintiff would be able to work in spite of his pain. Finally, defendants contend that the Commission should have considered Dr. King's testimony that there was no medical reason why plaintiff could not return to work within the limitations of the lifting restrictions. Again, a close reading of Dr. King's testimony reveals Dr. King's opinion that, while plaintiff's objective medical condition may not have directly prevented him from working within certain restrictions, plaintiff's subjective pain resulting from his back injury may have prevented him from working in any capacity. Furthermore, Dr. King opined, and the Commission found, that plaintiff's complaints of severe pain are genuine.

The record does not indicate that the Commission failed to consider the evidence cited by defendants. Rather, it is more likely that the Commission simply recognized that the evidence cited by defendants does not necessarily conflict with the conclusion that plaintiff is incapable of work due to pain. For this reason, we reject defendants' second argument.

### III.

[3] By their third argument, defendants contend that the Commission erred in finding that plaintiff had not reached the end of his healing period (also referred to as the point of "maximum medical improvement" or "MMI") by 4 January 1999. The Commission's finding states:

12. Dr. King determined that by 4 January 1999, he had exhausted all efforts for treatment of plaintiff's . . . back condition which he deemed appropriate, but plaintiff had not "gotten any

better anywhere along the way." On that basis, Dr. King stated that one could pick any date subsequent to 16 March 1998 as the date plaintiff's condition had reached a plateau in regard to recovery. For this reason, no weight is given to Dr. King's opinion on when plaintiff reached maximum medical improvement. *Plaintiff had not reached the end of his healing period on 4 January 1999.* However, Dr. King stated that it was possible that plaintiff may not be able to return to regular duty. Dr. King further noted that plaintiff's previous restrictions to alternate sitting and standing and to lift no more than five pounds remained appropriate.

(Emphasis added.) Defendants contend that this allegedly erroneous finding is significant because, had the Commission found that plaintiff *had* reached MMI by 4 January 1999, "it could not have concluded that plaintiff was entitled to disability benefits after January 4, 1999." We disagree because we believe the concept of MMI is not relevant under these circumstances.

An employee seeking indemnity benefits pursuant to the Workers' Compensation Act has, at the outset, two very general options.[2] First, an employee may seek indemnity benefits by showing that the employee has suffered a loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29 or N.C. Gen. Stat. § 97-30 (1999). *See* N.C. Gen. Stat. § 97-2(9) (1999) ("disability" is defined as an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment"). A loss of wage-earning capacity may either be total, in which case the employee is entitled to benefits pursuant to N.C. Gen. Stat. § 97-29, or partial, in which case the employee is entitled to benefits pursuant to N.C. Gen. Stat. § 97-30. *See Gupton v. Builders Transport*, 320 N.C. 38, 42, 357 S.E.2d 674, 678 (1987). If the loss of wage-earning capacity is total, the employee is entitled to receive benefits for as long as the total loss of wage-earning capacity lasts with no limitation as to duration. *See* N.C. Gen. Stat. § 97-29; *Vernon v. Steven L. Mabe Builders*, 336 N.C. 425, 434, 444 S.E.2d 191, 195 (1994). If the loss of wage-earning capacity is partial, the employee is entitled to receive benefits for as long as the partial loss of wage-earning capacity lasts, up to a maximum of 300 weeks. *See* N.C. Gen. Stat. § 97-30. In either case, the focus is upon the employee's loss of wage-earning capacity.

2. These two options are, of course, not exhaustive, since there are a few additional categories of other specific benefits available to particular claimants; examples include claims for death benefits, claims due to asbestosis and silicosis, and claims for hearing loss.

Furthermore, once an employee initially establishes a loss of wage-earning capacity, a presumption of "ongoing" or "continuing" disability arises, and the burden shifts to the employer to show that the employee is capable of earning wages. *See Brown v. S & N Communications, Inc.*, 124 N.C. App. 320, 329, 477 S.E.2d 197, 202 (1996); *Kennedy v. Duke Univ. Med. Center*, 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990). Finally, as to claims involving a loss of wage-earning capacity, it is important to recognize that, although the Act does not define the terms "temporary" or "permanent," *see Gamble v. Borden, Inc.*, 45 N.C. App. 506, 508, 263 S.E.2d 280, 281 (1980), an incapacity to earn wages (whether total under N.C. Gen. Stat. § 97-29 or partial under N.C. Gen. Stat. § 97-30) is often further categorized as either "temporary" or "permanent." *See, e.g., Watts v. Brewer*, 243 N.C. 422, 423, 90 S.E.2d 764, 766 (1956).

The second option available to an employee seeking indemnity benefits is to show that the employee has a specific physical impairment that falls under the schedule set forth in N.C. Gen. Stat. § 97-31 (1999), regardless of whether the employee has, in fact, suffered a loss of wage-earning capacity.[3] In order to receive scheduled benefits pursuant to N.C. Gen. Stat. § 97-31, an employee with a physical impairment that falls under the schedule need not establish a loss of wage-earning capacity because disability is presumed from the fact of the injury itself. *See, e.g., Watts v. Brewer*, 243 N.C. 422, 424, 90 S.E.2d 764, 767 (1956) (holding that the phrase "shall be deemed to continue" in N.C. Gen. Stat. § 97-31 means that an employee with an injury listed under N.C. Gen. Stat. § 97-31 is presumed to be disabled regardless of any actual loss of wage-earning capacity).

N.C. Gen. Stat. § 97-31 establishes a specific framework for claims falling under that section. It provides that compensation for a scheduled physical impairment is available during two specific periods of time: (1) during "the healing period" of the injury; and (2) for an additional, statutorily-prescribed period of time (referred to herein as "the statutory period"), which begins when the healing period ends and runs for the specific number of weeks set forth in the statute for each type of impairment. However, it is important to

---

3. We note that in cases where an employee has a specific physical impairment that falls under N.C. Gen. Stat. § 97-31, and is also able to show a loss of wage-earning capacity (whether partial or total), the employee may elect to seek benefits under whichever statutory section will provide the more favorable remedy. *See Whitley v. Columbia Lumber Mfg.* Co., 318 N.C. 89, 348 S.E.2d 336 (1986); *Gupton*, 320 N.C. 38, 357 S.E.2d 674.

recognize that, to the extent that N.C. Gen. Stat. § 97-31 allows for compensation for "disability during the healing period," it does not actually create an additional statutory basis for recovery beyond that found in N.C. Gen. Stat. § 97-29 and § 97-30. The reason that this language—allowing for compensation for "disability during the healing period"—is included in N.C. Gen. Stat. § 97-31 is simply to clarify that an employee who has suffered a physical impairment listed under N.C. Gen. Stat. § 97-31, and who, in addition, suffers a partial or total loss of wage-earning capacity during "the healing period" for that impairment, may (1) receive compensation pursuant to N.C. Gen. Stat. § 97-29 or § 97-30 during "the healing period" and (2) thereafter receive scheduled benefits provided in N.C. Gen. Stat. § 97-31 for the employee's specific physical impairment (regardless of any loss of wage-earning capacity). *See Watkins v. Motor Lines*, 279 N.C. 132, 136, 181 S.E.2d 588, 591 (1971) (citing *Rice v. Panel Co.*, 199 N.C. 154, 154 S.E. 69, (1930)).

For example, an employee who loses a thumb in a work-related accident, and who is unable to work during a seven-week healing period, and who then returns to work earning the employee's pre-injury wages, is entitled to seek the following compensation. First, prior to reaching the end of "the healing period," the employee may seek compensation for a loss of wage-earning capacity under N.C. Gen. Stat. § 97-29 or § 97-30. Second, once "the healing period" ends, the employee may seek compensation for the employee's specific physical impairment pursuant to N.C. Gen. Stat. § 97-31(1) for a duration of seventy-five weeks. *See Watts*, 243 N.C. 422, 90 S.E.2d 764; N.C. Gen. Stat. § 97-31(1).

Understanding this framework established by N.C. Gen. Stat. § 97-31 (contemplating a "healing period" followed by a statutory period of time corresponding to the specific physical injury) is crucial to understanding the primary legal significance of MMI. Because N.C. Gen. Stat. § 97-31 allows an employee to receive scheduled benefits for a specific physical impairment only once "the healing period" ends, the question naturally arises: how is it determined when the healing period ends? This Court has answered the question by holding that the healing period in N.C. Gen. Stat. § 97-31 ends at the point when the injury has stabilized, referred to as the point of "maximum medical improvement" (or "maximum improvement" or "maximum recovery"). *See, e.g., Crawley v. Southern Devices, Inc.*, 31 N.C. App. 284, 288, 229 S.E.2d 325, 328-29 (1976), *disc. review denied*, 292 N.C. 467, 234 S.E.2d 2 (1977); *see also Carpenter v. Industrial Piping Co.*,

KNIGHT v. WAL-MART STORES, INC.

[149 N.C. App. 1 (2002)]

73 N.C. App. 309, 311, 326 S.E.2d 328, 330 (1985). Thus, before an employee may receive scheduled benefits pursuant to N.C. Gen. Stat. § 97-31, it must be established that the employee has reached the point of MMI with regard to the employee's specific physical impairment and, therefore, that the healing period has ended and the employee's physical impairment has become permanent. Once this is established, an employee may receive benefits for the specific physical impairment for the statutory period set forth in N.C. Gen. Stat. § 97-31 that corresponds to that impairment.

It is also important to bear in mind that neither N.C. Gen. Stat. § 97-29 nor N.C. Gen. Stat. § 97-30 contemplates a framework similar to that established by N.C. Gen. Stat. § 97-31 (involving a "healing period" followed by a statutory period). Under N.C. Gen. Stat. § 97-29 or § 97-30, the analysis is much more simple: as noted above, an employee may receive compensation once the employee has established a total or partial loss of wage-earning capacity, and the employee may receive such compensation for as long as the loss of wage-earning capacity continues, for a maximum of 300 weeks in cases of partial loss of wage-earning capacity.

There is a great deal of confusion regarding what significance, if any, the concept of MMI has within the context of a loss of wage-earning capacity pursuant to either N.C. Gen. Stat. § 97-29 or § 97-30, and this confusion has produced two lines of case law exemplified recently in two opinions simultaneously issued by this Court. *See Anderson v. Gulistan Carpet, Inc.*, 144 N.C. App. 661, 670-71, 550 S.E.2d 237, 243-44 (2001) (holding that an employee may not receive temporary total disability benefits after the employee has reached MMI); *Russos v. Wheaton Indus.*, 145 N.C. App. 164, 167-68, 551 S.E.2d 456, 459 (2001) (holding that the Industrial Commission did not err in awarding the plaintiff ongoing temporary total disability benefits after she had reached MMI), *disc. review denied*, 355 N.C. 214, 560 S.E.2d 135, *reh'g denied*, 355 N.C. 494, 564 S.E.2d 44 (2002).

Until such time as either our legislature or our Supreme Court directly addresses and resolves the confusion in this area, it is incumbent upon this Court to attempt to clarify the law. Thus, we have carefully and thoroughly reviewed the Workers' Compensation Act and the case law, including our Supreme Court's recent denial of a petition for discretionary review in *Russos*.[4] We have concluded that the

4. We have also considered the import of our Supreme Court's *per curiam* opinion in *Neal v. Carolina Mgmt.*, 350 N.C. 63, 510 S.E.2d 375 (1999), reversing this Court's majority opinion and adopting the dissenting opinion in *Neal v. Carolina Management*,

primary significance of the concept of MMI is to delineate a crucial point in time *only within the context of a claim for scheduled benefits under N.C. Gen. Stat. § 97-31*, and that the concept of MMI does not have any direct bearing upon an employee's right to continue to receive temporary disability benefits once the employee has established a loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29 or § 97-30.

It should first be noted that compensation received during "the healing period" under N.C. Gen. Stat. § 97-31 is sometimes referred to as compensation for "temporary disability," and compensation received during the statutory period under N.C. Gen. Stat. § 97-31 is sometimes referred to as compensation for "permanent disability." *See, e.g., Crawley*, 31 N.C. App. at 288, 229 S.E.2d at 328. Thus, in *Carpenter*, where the plaintiff sought benefits based upon a specific physical impairment listed under N.C. Gen. Stat. § 97-31, this Court stated: "Plaintiff seeks to recover under G.S. 97-31. That section provides for compensation of temporary disability during the healing period of the injury and for permanent disability at the end of the healing period, when maximum recovery has been achieved." *Carpenter*, 73 N.C. App. at 311, 326 S.E.2d at 329.

Although these statements in *Carpenter* were clearly made within the specific context of an employee seeking to recover pursuant to N.C. Gen. Stat. § 97-31, this Court in *Franklin v. Broyhill Furniture Industries*, 123 N.C. App. 200, 472 S.E.2d 382, *cert. denied*, 344 N.C. 629, 477 S.E.2d 39 (1996), appears to have interpreted *Carpenter* as holding that *all* "temporary" disability benefits (even those awarded under N.C. Gen. Stat. § 97-29 or § 97-30) may only be received during "the healing period" (or prior to reaching MMI), and that after reaching MMI, an employee may only receive permanent benefits:

> Temporary total disability is payable only "during the healing period." The "healing period" ends when an employee reaches "maximum medical improvement." Only when an employee has reached "maximum medical improvement" does the question of her entitlement to permanent disability arise.

130 N.C. App. 228, 502 S.E.2d 424 (1998). We interpret the dissenting opinion, and therefore the Supreme Court's *per curiam* opinion, as standing for the narrow proposition that "maximum medical improvement, by definition, means that the employee's healing period has ended." *Id.* at 235, 502 S.E.2d at 429.

KNIGHT v. WAL-MART STORES, INC.

[149 N.C. App. 1 (2002)]

> *Once an employee has reached her "maximum medical improvement," she may establish permanent incapacity pursuant to either section 97-29, -30, or -31.*
>
>     . . . .
>
> In this case, the Commission determined, and plaintiff does not dispute, that plaintiff reached maximum medical improvement on 4 January 1993. *Thus, it was improper to award the plaintiff temporary total disability after this date.*

*Id.* at 204-05, 206, 472 S.E.2d at 385, 386 (citations omitted) (emphasis added). In other words, the Court appears to have applied the framework established by N.C. Gen. Stat. § 97-31 (wherein MMI marks the end of "the healing period") to benefits received under N.C. Gen. Stat. § 97-29 and § 97-30. Based upon this construction of the law, the Court in *Franklin* held that the only options available to the plaintiff after reaching MMI were benefits for (1) *permanent* total disability under N.C. Gen. Stat. § 97-29, (2) *permanent* partial disability under N.C. Gen. Stat. § 97-30, or (3) scheduled benefits under N.C. Gen. Stat. § 97-31. *Id.* at 206-07, 472 S.E.2d at 387.

*Franklin* appears to hold that MMI serves to delineate the point in time when "temporary disability" ends and "permanent disability" begins, *even within the context of a loss of wage-earning capacity established pursuant to N.C. Gen. Stat. § 97-29 or § 97-30.* In fact, it has become increasingly common for parties to argue precisely such a proposition to this Court, expressly relying upon *Franklin*. However, to the extent that *Franklin* states that an employee may not receive temporary total disability benefits under N.C. Gen. Stat. § 97-29 after the employee reaches MMI, such holding is inconsistent with *Carpenter* and the Workers' Compensation Act, and also conflicts with prior case law. *See, e.g., Watson v. Winston-Salem Transit Authority,* 92 N.C. App. 473, 475, 374 S.E.2d 483, 485 (1988) ("[w]e hold that the Industrial Commission erred in finding that because plaintiff reached maximum medical improvement she was not entitled to additional temporary total disability payments").

Perhaps more significantly, *Franklin* seems to imply (and, in fact, defendants here argue) that, in general, once an employer establishes that an employee has reached MMI, (1) any presumption of ongoing temporary disability established pursuant to N.C. Gen. Stat. § 97-29 or § 97-30 is thereby rebutted, (2) the burden of proof shifts back to the employee, and (3) the employee may only receive disability benefits

if the employee establishes the existence of a "permanent" disability. *See, e.g., Anderson,* 144 N.C. App. at 670, 550 S.E.2d at 243-44 (where this Court, in a case involving a total loss of wage-earning capacity, interpreted *Franklin* in precisely this way).

In fact, as established by case law both prior to *Franklin* and since *Franklin,* the concept of MMI does not have any direct bearing upon an employee's right to continue to receive temporary disability benefits (or upon an employee's presumption of ongoing disability) once the employee has established a loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29 or § 97-30. *See Watson,* 92 N.C. App. at 476, 374 S.E.2d at 485 ("[t]he maximum medical improvement finding is *solely* the prerequisite to determination of the amount of any permanent disability for purposes of G.S. 97-31" (emphasis added)); *Russos,* 145 N.C. App. at 167-68, 551 S.E.2d at 459 (holding that finding of MMI does not rebut presumption of ongoing disability, and that cases holding to the contrary, such as *Franklin,* are not supported by case law). An employee who establishes a total or partial loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29 or § 97-30 is entitled to continue to receive benefits for as long as the loss of wage-earning capacity continues (up to a maximum of 300 weeks for partial disability), regardless of whether the employee's *physical injury* has reached a point of maximum medical improvement or not. The primary significance of the concept of MMI (or "maximum improvement" or "maximum recovery") is to delineate when "the healing period" ends and the statutory period begins in cases involving an employee who may be entitled to benefits for a physical impairment listed in N.C. Gen. Stat. § 97-31. In other words, MMI represents the first point in time at which the employee may elect, *if the employee so chooses,* to receive scheduled benefits for a specific physical impairment under N.C. Gen. Stat. § 97-31 (without regard to any loss of wage-earning capacity). MMI does not represent the point in time at which a loss of wage-earning capacity under N.C. Gen. Stat. § 97-29 or § 97-30 automatically converts from "temporary" to "permanent."[5]

___

5. The confusion in this area is not surprising given that compensation received during "the healing period" under § 97-31 is sometimes referred to as compensation for "temporary disability," and compensation received during the statutory period under § 97-31 is sometimes referred to as compensation for "permanent disability." *See, e.g., Carpenter,* 73 N.C. App. at 311, 326 S.E.2d at 329. Such terminology tends to obscure the crucial distinction between the healing period/statutory period framework under N.C. Gen. Stat. § 97-31 (where MMI signifies a point in time when an employee's *physical impairment* becomes permanent) and the temporary/permanent framework under § 97-29 and § 97-30 (where the permanency of an employee's *wage-earning*

**KNIGHT v. WAL-MART STORES, INC.**

[149 N.C. App. 1 (2002)]

In the present case, even assuming *arguendo* that defendants are correct that Dr. King's testimony clearly established that plaintiff had reached MMI prior to the hearing, and that, therefore, the evidence does not support the Commission's finding that plaintiff had not reached MMI as of the hearing, we find such error to be immaterial at this time. *See Vaughn v. Dept. of Human Resources,* 37 N.C. App. 86, 90, 245 S.E.2d 892, 894 (1978) (to warrant reversal, an error made by the Industrial Commission must be material and prejudicial), *affirmed,* 296 N.C. 683, 252 S.E.2d 792 (1979). Plaintiff has established a total loss of wage-earning capacity pursuant to N.C. Gen. Stat. § 97-29. He has not sought scheduled benefits pursuant to N.C. Gen. Stat. § 97-31, nor has he sought to establish that his total loss of wage-earning capacity is permanent.[6] He is, therefore, entitled to an "ongoing award of disability benefits" equal to two-thirds of his average weekly wages for as long as he remains totally disabled. *Lackey v. R. L. Stowe Mills,* 106 N.C. App. 658, 663, 418 S.E.2d 517, 520, *disc. review denied,* 332 N.C. 345, 421 S.E.2d 150 (1992). At this point in time, it matters not whether plaintiff has reached MMI.[7] Because any error as to whether plaintiff has reached maximum medical improvement is immaterial at this time, we need not address whether the Commission erred in finding that plaintiff had not reached MMI.

IV.

[4] In its Opinion and Award, the Commission entered the following finding of fact, pertinent to defendants' fourth argument:

9. After the remedial surgery, plaintiff's psychological condition became unstable and he attempted to withdraw from his pain medications too quickly causing him to become physically and psychologically ill. Consequently, plaintiff entered a detoxification unit for three days.

By their fourth argument, defendants contend that they should not bear the cost of plaintiff's detoxification program because the finding

*capacity* is necessarily determined by more than merely an assessment of the status of the employee's physical impairment).

6. We do not address the role that MMI might play where an employee receiving benefits under § 97-29 or § 97-30 seeks to establish that the employee's loss of wage-earning capacity is *permanent.*

7. At some later point in time, plaintiff may seek to recover benefits for a specific physical impairment under N.C. Gen. Stat. § 97-31, in which case the question of whether he has reached MMI would be relevant. Also, at some later point in time, plaintiff may seek to establish that his loss of wage-earning capacity is *permanent,* in which case the question of whether he has reached MMI may be relevant.

of fact above is not supported by any *medical* evidence. However, the record reveals that defendants' assignment of error actually contends that this finding of fact is not based upon *any* competent evidence (whether medical or otherwise).

The finding in question is supported by competent evidence. Plaintiff testified: that Dr. King initially prescribed "heavy narcotic pain medication over a period of about six months"; that when plaintiff ran out of the medication, Dr. King decided not to prescribe a refill because he believed plaintiff was taking too much of it; that plaintiff abruptly discontinued taking the pain medication and experienced some withdrawal symptoms; and that, as a result, plaintiff entered a detoxification program in Hamlet, North Carolina. This testimony is competent evidence that supports the Commission's finding of fact, and we reject defendants' fourth argument.

V.

**[5]** Lastly, defendants argue that the Commission erred in failing to award defendants a credit for having advanced plaintiff's share of the mediator's fee against the compensation due plaintiff. Prior to the hearing in this case, the parties stipulated that defendants had paid the mediator's fee of $375.00 in full, thereby advancing plaintiff's share of $187.50. Rule 7(c) of the Rules for Mediated Settlement and Neutral Evaluation Conferences of the North Carolina Industrial Commission provides that, "[u]nless otherwise . . . ordered by the Commission," all parties must pay equal shares of the mediator's fee. In such situations, the defendant is required to "pay the plaintiff's share, as well as its own, and the defendant shall be reimbursed for the plaintiff's share when the case is concluded from benefits that may be determined to be due to the plaintiff." R. Mediated Settlement Confs. Of N.C. Indus. Comm'n 7(c), 2002 Ann. R. N.C. 794, 795.

Here, at the conclusion of its Opinion and Award, the Commission entered the following order: "Defendants shall pay the costs." Thus, pursuant to the authority vested in the Commission by Rule 7(c), the Commission apparently concluded that the costs of the mediated settlement conference should not be apportioned as set forth in Rule 7(c), and further that plaintiff should not be obligated to share in the payment of such costs. We hold that the Commission did not err in entering this order, and we, therefore, reject defendants' final argument.

For the reasons set forth herein, we affirm.

KEENER LUMBER CO. v. PERRY

[149 N.C. App. 19 (2002)]

Affirmed.

Judge McGEE concurs.

Judge BRYANT dissents in part.

BRYANT, Judge, dissenting in part.

I dissent from the portion of the majority opinion relating to whether the concept of MMI is material to Issue # 3. That issue on appeal is whether, once the employee has established loss of wage earning capacity pursuant to N.C. Gen. Stat. § 97-29 or N.C. Gen. Stat. § 97-30, the employee may continue to receive temporary total disability after having reached maximum medical improvement. In two prior decisions of this Court, we addressed this issue. In *Anderson v. Gulistan Carpet, Inc.*, 144 N.C. App. 661, 550 S.E.2d 237 (2001), a panel of this Court answered that issue, "no"; however, in another opinion filed on the same day as *Anderson*, a different panel in *Russos v. Wheaton Industries*, 145 N.C. App. 164, 551 S.E.2d 456, *disc. review denied*, 355 N.C. 214, 560 S.E.2d 135 (2001) answered, "yes". No appeal was taken by the parties from the *Anderson* decision; and, our Supreme Court declined to grant discretionary review of the *Russos* decision.

Manifestly, a conflict of panels on this Court requires a decision from our Supreme Court. N.C. Gen. Stat. § 7A-30(2). Accordingly, I dissent from the majority decision for the reasons stated in *Anderson* and thereby afford the defendants the opportunity to appeal this issue directly to the Supreme Court to obtain a definitive opinion.