***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman as supplemented by the statement made by plaintiff to the insurance adjuster, the Form 19 filed by defendants, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner in her denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the Workers' Compensation Act at all relevant times.
2. An employee-employer relationship existed at all relevant times.
3. At all relevant times, Pillowtex Corporation was insured by Crum Forester with Crawford and Company as the adjusting agent.
4. The date of plaintiff's alleged injury by accident is on or about June 5, 2001.
5. Plaintiff started missing time from work on or about November 17, 2001 and has not returned to work.
In addition, the parties stipulated into evidence the following:
1. Packet containing one hundred fifty-seven pages of medical records and reports;
2. Additional medical records submitted April 1, 2003;
3. Additional medical records submitted April 4, 2003; and
4. Form 22 wage chart which was also submitted after the hearing before the Deputy Commissioner.
The Pre-Trial Agreement dated November 5, 2002 which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, born June 30, 1948, was employed by Pillowtex and its predecessors at the Cannon Mills site for twenty-six years. In June 2001, she was a modular worker, part of a seven-person team that operated machines and inspected towels. On the day in question, plaintiff's job duties involved loading towel material into a computerized machine, operating the machine that cut and hemmed the towels, inspecting the towels after they came out on the conveyor, separating the seconds and irregulars from the first quality towels, and then placing all of the towels in the correct places.
2. The towel material which was to be run through the machine was flaked onto a "truck" that the employees would roll up to the hemming machine. They would pull the top end of the layered material over a bar and then thread it into the machine. After the settings had been entered into the computer, the machine would pull the continuous sheet of material through the cutting blade according to the length specified by the operator. The machine would then fold and stitch the ends. The amount of material flaked onto the truck varied considerably, so the height of the top end of the stack of material also varied. On the night in question, the stack was especially high.
3. On June 5, 2001, plaintiff injured her neck and shoulder when she had to reach up to hold back the towel material on a truck that was beginning to tip over because it had been stacked too high. Plaintiff had preexisting problems with her cervical spine and had undergone a cervical fusion of C4-5 and C5-6 in 1995. She had been able to return to work after the procedure and had done generally well, but had occasional symptoms associated with cervical spondylosis. On May 3, 2001, plaintiff saw her internist, Yogesh K. Patel, M.D., with complaints of problems in her left shoulder. She mentioned to him that she had been in a motor vehicle accident on February 15, 2001, and might have hit her left shoulder on the car door. However, based upon subsequent medical records, it did not appear that she believed her symptoms were related to the accident.
4. No injury was reported at work on June 5, 2001. Before her work shift started on June 6, 2001, plaintiff went to the emergency room complaining of left arm pain and a knot under her arm. When she reported her symptoms at work later that day, plaintiff described some sort of association with work, but the specifics were not revealed by the evidence. On June 14, 2001, she went back to Dr. Patel, who noted "persistent" symptoms of left shoulder and arm pain. He made no notation of an injury at work. Although plaintiff saw him regularly, she never described to him an injury occurring at work. Dr. Patel referred plaintiff to John Wassel, M.D., an orthopedic surgeon, who examined her on June 26, 2001. Dr. Wassel noted that plaintiff attributed her symptoms to pulling heavy towels at work.
5. On the Form 19 filed by defendants with the Industrial Commission on August 5, 2001, plaintiff reported that she felt a pull in her left arm while lifting and pulling towels in a towel truck on June 5, 2001.
6. Plaintiff saw Frederick E. Finger, M.D., a neurosurgeon, on August 7, 2001, and reported onset of neck and left arm pain beginning in June 2001. Dr. Finger diagnosed her with a partially "frozen" shoulder and with C6 radiculopathy. Plaintiff was instructed to follow up with Dr. Wassel regarding the shoulder problems, but Dr. Finger treated her for radicular symptoms. The doctor ultimately performed surgery to fuse the C6-7 interspace. Because the frozen shoulder symptoms persisted and since plaintiff had not returned to Dr. Wassel for treatment, Dr. Finger subsequently referred her to Patrick Connor, M.D., an orthopedic surgeon who specialized in treating shoulder problems. Dr. Connor treated plaintiff with medication and physical therapy for adhesive capsulitis.
6. Plaintiff believes that the C6 radiculopathy and the adhesive capsulitis of her left shoulder for which she was treated beginning in 2001were due to a specific incident that occurred at work on June 5, 2001.
7. In her statement to the insurance adjuster taken on June 13, 2001 (eight days after the accident and injury), plaintiff stated she normally worked as part of a seven-person team. However, because of shortage of help, she worked on June 5, 2001, with only three other people instead of six. This had occurred for approximately 2.5 months but was not considered to be the norm for the job. Under normal conditions plaintiff worked a 2.5-hour rotation. On June 5, 2001, she and her partner had to work 4-hour rotations.
8. Plaintiff described the incident on June 5, 2001, as follows:
 We had some overloaded trucks and lots of time when we pull the trucks, the trucks are so heavy . . . when you go to pull them in to hook the truck up, sometimes they have towels that flop over on the back side and you go . . . lots of time . . . in order for the machine to quit stopping off, you just have to go up under there and try to lift the towels up so they will run through the machine and I remember getting inside the truck trying to lift the towels up so that they would run through the machine. . . . Well I had pulled those towels in and when I came down, I had started inspecting the towels and I noticed my arm was stinging a little bit but, you know, I just didn't pay it no attention because at that particular time, we had so much work on the table so I was trying to hurry up and get it done. And so, you know, it is just normal. I just go ahead on and try to get the job caught up.
9. Working as a 4-person team instead as a 7-person team constituted an interruption in the work routine likely to lead to unexpected consequences. The haste necessary for the smaller team to do the same work also constituted an interruption in the work routine likely to lead to unexpected consequences. Reaching high in the air to keep the towels from toppling over also constituted an interruption in the work routine likely to lead to unexpected consequences. The injury to plaintiff's cervical spine on July 5, 2001, qualifies as a specific traumatic incident of the work assigned with respect to her neck injury.
10. Although plaintiff was not the best historian, the Full Commission finds her to be credible. On the whole and although there was conflicting evidence, what happened at the workplace on June 5, 2001, and what was testified to by plaintiff was corroborated by other evidence.
11. The Form 22 submitted by the defendants shows plaintiff earned an average weekly wage of $532.21, yielding a compensation rate of $354.81 per week.
12. Because of her compensable injuries, plaintiff was unable to earn wages during the period from November 17, 2001, through the date of the hearing before the Deputy Commissioner and continuing.
13. Due to the restrictions placed upon plaintiff as a result of her compensable injuries, defendants did not offer a suitable light-duty job to plaintiff.
14. The incident at work on June 5, 2001, resulted in a shoulder injury and a neck injury. The neck injury aggravated and made symptomatic an underlying degenerative condition of plaintiff's neck and resulting two-level fusion stemming from a previous injury covered by workers' compensation.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On June 5, 2001, plaintiff sustained both an injury by accident arising out of and in the course of her employment with defendant-employer and a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6); Calderwood v.Charlotte-Mecklenburg Hospital Authority et al., 135 N.C. App. 112,519 S.E.2d 61 (1999); Gabriel v. Newton, 227 N.C. 314, 316, 42 S.E.2d 96,97 (1947) (explaining "an unlooked for and untoward event"); Edwards v.Publishing Co., 227 N.C. 184, 186, 41 S.E.2d 592, 593 (1947) (explaining "an unexpected, unusual, or undesigned occurrence"). While the case law interpreting the specific traumatic incident provision of subsection (6) requires the plaintiff to prove an injury at a cognizable time, this does not compel the plaintiff to allege the specific hour or day of the injury. Fish v. Steelcase, Inc., 116 N.C. App. 703, 449 S.E.2d 233
(1994), cert. denied, 339 N.C. 737, 454 S.E.2d 650 (1995). By amending the second sentence of subdivision (6) to say that an accident with respect to back injuries includes an injury that is the "result of a specific traumatic incident," the General Assembly intended to relax the requirement that there be some unusual circumstance that accompanied the injury; the use of the words "specific" and "incident" means that the trauma or injury must not have developed gradually but must have occurred at a cognizable time. Bradley v. E.B. Sportswear, Inc., 77 N.C. App. 450,335 S.E.2d 52 (1985). Nothing in subsection (6) precludes compensation for a back injury which occurs in the normal work routine. Fish v.Steelcase, Inc., 116 N.C. App. 703, 449 S.E.2d 233 (1994), cert. denied,339 N.C. 737, 454 S.E.2d 650 (1995). Where a claimant who performed secretarial tasks for her employer, suffered back pain the day after she helped carry a heavy, unwieldy spotlight up a flight of steps while walking backwards and bending over at the waist, the claimant's injury resulted from a specific traumatic incident that occurred at a cognizable time. Beam v. Floyd's Creek Baptist Church, 99 N.C. App. 767,394 S.E.2d 191 (1990).
2. Plaintiff is entitled to payment of (or reimbursement of) plaintiff's treatment in the emergency room on June 6, 2001, and her treatment with Drs. Wassel, Connor, Finger and Patel with respect to her arm, shoulder, and neck pain arising from the injury by accident and specific traumatic incident of June 5, 2001. N.C. Gen. Stat. § 97-25.
3. Plaintiff is entitled to compensation at the rate of $354.81 per week from November 17, 2001, and continuing until she returns to work for wages or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29. Knight v. Wal-Mart, 149 N.C. App. 1, 562 S.E.2d 434
(2002), affirmed, 357 N.C. 44, 577 S.E.2d 620 (2003).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to the attorney fee hereafter set forth, defendants shall pay to plaintiff $354.81 per week from November 14, 2001, until plaintiff returns to work for wages or until further order of the Industrial Commission. Defendants shall pay in a lump sum all compensation that has accrued. Defendants shall pay 25% of the lump sum compensation directly to plaintiff's counsel and shall thereafter pay every fourth check directly to plaintiff's counsel. Defendants shall pay to plaintiff interest at 8 percent per year on all amounts from November 5, 2002, until paid.
2. Defendants shall pay for (or reimburse those who paid for) plaintiff's treatment in the emergency room on June 6, 2001, and her treatment with Drs. Wassel, Connor, Finger and Patel with respect to her arm and shoulder pain and her neck pain arising from the injury by accident and specific traumatic incident of June 5, 2001. Such payments or reimbursements shall be as much as but no more than the amounts allowed for the treatment by the Industrial Commission Medical Fee Schedule. Plaintiff's counsel shall assist plaintiff in compiling the bills and payments to the medical providers. Payment shall include the fusion surgery to C7. N.C. Gen. Stat. § 97-25.
3. Defendants shall pay the costs.
This 17th day of November 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER