***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award and therefore the Full Commission affirms the prior Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. The alleged date of injury or occupational disease is May 6, 2003.
2. On May 6, 2003, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On May 6, 2003, an employer-employee relationship existed between plaintiff and defendant-employer.
4. On May 6, 2003, defendant-employer regularly employed more than three employees in North Carolina.
5. Plaintiff underwent surgery performed by Dr. Russell Garland on May 6, 2003, consisting of (1) flexor origin slide with partial medial epicondylectomy, (2) in situ decompression of the ulnar nerve, (3) diagnostic arthroscopy with limited debridement, (4) arthroscopic subacromial decompression with resection of the distal clavicle, and (5) placement of a pain buster catheter.
6. Plaintiff was out of work from May 6, 2003 until July 1, 2003.
7. Plaintiff's average weekly wage is $1,832.59, resulting in a maximum compensation rate for the year 2003 of $674.00.
8. Defendant-carrier Universal Underwriter's Insurance Company (hereinafter "Universal") provided workers' compensation insurance coverage to defendant-employer from September 1, 1999, through September 1, 2002.
9. Defendant-carrier Southern Guaranty Insurance Company (hereinafter "Southern Guaranty") provided workers' compensation insurance coverage for defendant-employer from September 1, 2002 and continuing at least through the date of the Deputy Commissioner's hearing.
10. The contested issues to be decided by the North Carolina Industrial Commission are:
(a) Whether plaintiff sustained an injury by accident pursuant to N.C. Gen. Stat. § 97-2(6) or occupational disease pursuant to N.C. Gen. Stat. § 97-53(13).
(b) Whether Southern Guaranty or Universal was the carrier on the risk at the time of the injury or occupational disease.
(c) Whether plaintiff is entitled to any compensation.
 (d) Whether plaintiff is entitled to medical treatment pursuant to N.C. Gen. Stat. § 97-25.
 ***********
Based upon the competent evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 41 years old with a high school education. Since 1983, plaintiff has been employed doing body work and collision repair on vehicles. This is a production-based job in which the more vehicles plaintiff repairs, the more money he is paid. Plaintiff has worked for defendant-employer doing this type of work since 1995. Plaintiff has worked with a handful of other employers concurrently, but only for a few days or weeks at a time and only on a few occasions.
2. Plaintiff's job with defendant-employer involves repairing damaged cars and returning them to their earlier condition. First, the vehicle being repaired is clamped down to a "frame machine," which is a ramp that elevates the vehicle. Plaintiff then stretches out damaged areas on the vehicle's exterior with chains so that he can reach and repair the damaged parts on the vehicle's interior.
3. Plaintiff must work underneath the vehicles while they are on the frame machine and usually has to lie flat on his back to remove 30-60 bolts per vehicle. Sometimes plaintiff can do this job from a sitting position. Whether plaintiff is lying on his back or sitting, plaintiff's removal of the bolts requires both of his arms to be extended upwards and away from his chest and often over his shoulders. To remove the bolts, plaintiff usually uses an "air ratchet" tool. Plaintiff reaches overhead and out in front of him to operate the air ratchet and remove the bolts, which takes anywhere between 15-30 minutes depending on how badly the vehicle is damaged and how many bolts are involved.
4. After removing the bolts, plaintiff visually and manually inspects the internal structures of the vehicle and uses computer diagnostics to locate the damage. When the damage is located, plaintiff separates the vehicle's "core support," which is where the factory welded panels together in the vehicle's frame. To separate the core support, plaintiff uses an air chisel, which is similar to a small jackhammer. The air chisel vibrates at 120 pounds per square inch pressure and requires plaintiff to push and hold the handle so that the tool does not jerk away. Plaintiff uses his arms the entire time he operates the air chisel.
5. After using the air chisel, plaintiff uses a T-grinder tool to grind paint and debris off the separated panels of the core support so the panels can be welded back together after repairs. The T-grinder is an electric sander with a sanding pad about 8-10 inches in diameter. Plaintiff has to hold the handle of the T-grinder and push down on it in order to keep it from jerking away. Plaintiff uses both of his arms while operating the T-grinder.
6. After using the T-grinder and welding the panels back together, plaintiff puts primer on the repaired areas and uses other tools to produce a finer, smoother finish than the T-grinder. Plaintiff uses a fine sander or a "DA" tool, which requires the use of both of his arms.
7. Plaintiff then refastens the bolts, using the same process and air ratchet that he used to remove them. Plaintiff performs bodywork, which includes grinding around any dents, hammering the dents out, and wiping the area with filler called "Bondo" by using a tool called a "Bondo buster." The "Bondo buster" is very difficult to use because of the vibrations and movements, and plaintiff can only operate it for five or ten minutes before his arms tire.
8. After using the "Bondo buster," plaintiff uses an "idiot stick" or a manual sander to finish the details of the repair work. Plaintiff tapes the repair site, puts primer on it, and "blocks it," by sanding it again by hand. The vehicle then goes to the painter for final painting.
9. For any given vehicle, plaintiff spends between one hour and two days to perform and complete the cycle of repairs, but usually one day is the normal time. Plaintiff normally worked over 12 hours a day, including a lunch break when time permitted, and often worked seven days a week. However, plaintiff's hours eventually were shortened because of a reduction in defendant-employer's business.
10. In most, if not all, of plaintiff's work activities, plaintiff used both of his arms continuously and repetitively. In approximately 2001 while working with defendant-employer, plaintiff noticed that his arms started to bother him. Plaintiff had problems picking things up. Plaintiff's arms hurt for a long time before he first went to a doctor.
11. Plaintiff eventually saw Dr. Russell Garland, an orthopedic surgeon in Charlotte, on January 16, 2002. An MRI was performed, which had abnormal findings. After physical examinations and other diagnostic studies, Dr. Garland diagnosed plaintiff with impingement syndrome, otherwise known as "bursitis," in plaintiff's right shoulder. Dr. Garland recommended cortisone injections and in February 2002, recommended that plaintiff undergo surgery on his right shoulder. Despite Dr. Garland's opinions that plaintiff needed surgery and should remove himself from his employment in auto body and collision repair, plaintiff continued to work because he could not afford to stop working.
12. Dr. Garland performed surgeries on plaintiff's feet for a non-work-related condition on February 12, 2002, March 13, 2002, and March 14, 2002. After these surgeries, plaintiff returned to work earlier than recommended and consequently had post-operative complications, including infections.
13. Plaintiff's upper extremity problems continued to worsen during this time. In July 2002, Dr. Garland diagnosed plaintiff with epicondylitis in his right elbow. Plaintiff also had epicondylitis in his left elbow, and Dr. Garland eventually diagnosed him with bursitis, or impingement syndrome, in his left shoulder, as well as his right shoulder.
14. On May 6 and 7, 2003, plaintiff underwent a right medial epicondylectomy with a flexor slide, a decompression of the right ulnar nerve, and right shoulder decompression. Although plaintiff wanted Dr. Garland to perform surgery to address his left upper extremity problems at the same time, Dr. Garland would not do this because of the limitations it would impose upon both of plaintiff's upper extremities at the same time. The surgery is reasonably required to address plaintiff's upper extremity problems. Plaintiff has not yet reached maximum medical improvement and still needs surgery on his left elbow and shoulder. Since Dr. Garland last treated plaintiff for his upper extremity conditions, Dr. Garland relocated to Tennessee and no longer practices medicine in Charlotte, North Carolina. Plaintiff's request to continue his treatment with Dr. Garland or to transfer his treatment to Dr. Barron is reasonably required to effect a cure, provide relief or lessen plaintiff's period of disability. Plaintiff's request to change physicians was made within a reasonable time.
15. Plaintiff was unable to earn the same or greater wages and missed work from May 6, 2003, through July 1, 2003, because of surgery. On July 1, 2003, plaintiff returned to work with defendant-employer, again earlier than Dr. Garland recommended.
16. Plaintiff has numerous limitations from his bilateral upper extremity conditions, including the limited ability to perform repetitive activity (particularly with the wrist dorsiflexed), limited strength, limited ability to lift at any level, but particularly at or above the shoulder level, and limited ability to maintain or hold his arms at or above shoulder level. Although Dr. Garland anticipated some improvement in plaintiff's condition following the additional surgeries he recommended, Dr. Garland expects plaintiff's limitations to be permanent. Nevertheless, since July 1, 2003, plaintiff has continued to work with defendant-employer. Plaintiff argued that this work is not suitable employment, but did not appeal this issue to the Full Commission.
17. Plaintiff's work activities caused or significantly contributed to his bilateral upper extremity conditions. Plaintiff's other work activities with different employers might have contributed to a very minor degree to plaintiff's medical conditions, but his work activity at defendant-employer is the most significant factor in his development of these conditions.
18. Plaintiff's work duties exposed plaintiff to a greater risk of developing the bilateral upper extremity conditions for which Dr. Garland treated plaintiff than the general public so exposed.
19. Plaintiff's conditions developed over time as he performed the same job duties for defendant-employer. Therefore, plaintiff was last injuriously exposed to the hazards of his employment while working for defendant-employer after September 1, 2002, when Southern Guaranty was on the risk.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of the repetitive nature of his job duties, plaintiff sustained occupational diseases to both shoulders and elbows, which were caused by and due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendant-employer. Plaintiff's shoulder and elbow conditions are not ordinary diseases of life to which the general public not so employed is equally exposed and are therefore compensable occupational diseases. N.C. Gen. Stat. § 97-53(13); Booker v. MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979). Plaintiff's bursitis also satisfies the requirements for compensability under N.C. Gen. Stat. §97-53(17).
2. Plaintiff was totally disabled from any employment as a result of his compensable injuries between May 6, 2003, and July 1, 2003 and is entitled to temporary total disability at the rate of $674.00 per week for the period May 6, 2003 through July 1, 2003. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to all reasonably necessary medical compensation related to his bilateral upper extremity conditions, including all the treatment provided to him thus far, as well as all treatment recommended in the future which tends to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1.
4. Plaintiff is entitled to have his treatment continued with Dr. Garland, if plaintiff so desires. If plaintiff decides that Dr. Garland's office is too far to travel, plaintiff may choose Dr. Barron to continue his care. See Kanipe v. Lane Upholstery, 141 N.C. App. 620, 540 S.E.2d 785
(2000) (defendant's right to control medical treatment attaches only once they have voluntarily accepted liability for plaintiff's claim).
5. Southern Guaranty is the carrier on the risk for this claim, since plaintiff was last injuriously exposed to the hazards of his employment with defendant-employer after September 1, 2002. N.C. Gen. Stat. § 97-57.
6. Plaintiff has not yet reached maximum medical improvement and is in need of additional medical treatment. Accordingly, the issue of the amount of permanent partial disability that plaintiff might receive, as well as plaintiff's entitlement to further total disability, is reserved for future decision. N.C. Gen. Stat. §§ 97-29, 97-30, 97-31. See Knight v. Wal-MartStores, Inc., 149 N.C. App. 1, 562 S.E.2d 434 (2002), aff'd per curiam,357 N.C. 44, 577 S.E.2d 620 (2003).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendant-employer and Southern Guaranty shall pay plaintiff temporary total disability compensation at the rate of $674.00 per week from May 6, 2003 through July 1, 2003. This amount has accrued and shall be paid in a lump sum.
2. Defendant-employer and Southern Guaranty shall pay all reasonably necessary medical compensation related to plaintiff's compensable bilateral upper extremity conditions. This includes treatment provided by Dr. Garland, and any treatment to be provided in the future by Dr. Garland or a physician of plaintiff's choosing, subject to statutory limitations.
3. Plaintiff's counsel is awarded an attorney's fee in the amount of 25% of all compensation awarded in Award paragraph 1.
4. In the event that the portion of this Opinion and Award which finds Southern Guaranty the carrier on the risk is appealed to the North Carolina Court of Appeals, Southern Guaranty is ordered pursuant to N.C. Gen. Stat. § 97-86.1 to comply with all portions of this Opinion and Award. Southern Guaranty shall be reimbursed by Universal if Universal is ultimately held liable.
5. Defendants shall pay the costs due the Commission.
This the 8th day of July 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER