***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Dollar.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant is a duly qualified self insured with Comp Management, Inc., as its Third-Party Administrator.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an injury by specific traumatic incident of the work assigned, arising out of and in the course of his employment with defendant-employer on February 10, 2000. Defendant filed an I.C. Form 60 on July 28, 2000, and paid plaintiff forty-one weeks of temporary total disability benefits, until September 16, 2001.
5. Plaintiff's average weekly wage was $652.27, which yields a compensation rate of $434.87 per week.
6. The issues for determination are:
a. Is the four-hour per day job of blowing off furniture suitable employment;
b. Does plaintiff require further medical treatment, including under the N.C. Gen. Stat. § 97-25.2 Order, any additional testing recommended by Dr. Scott McCloskey, and authorization of a doctor to continue to medications prescribed by Dr. Tananis, who is relocating;
c. Whether plaintiff had reached maximum medical improvement; and,
d. Whether plaintiff is entitled to additional compensation as a result of the compensable injury.
7. The parties stipulated the following documentary evidence:
a. I.C. Forms — 18, 19(2), 21, 22, 25N, 28, 28B, 33 (2), 33R, 60, and 62;
b. August 6, 2002 Order regarding Second Opinion;
c. Job Description: Pump Hose Operator;
d. Records of Caldwell Industrial Machine;
f. Records of Hickory Orthopaedic Center;
g. Records of Neurology Associates;
h. Records of Unifour Pain Treatment Center;
i. Records of Wake Forest University;
j. Records of Rehabilitation Specialists;
k. Records of Dr. Gregory Rosenfeld;
l. Records of Burke Rehabilitation Center;
m. Records of Dr. John McMenem;
n. ARI-Rehab Nurse Notes;
o. Employment Records;
p. Records of Dr. Mokris;
q. Records of Dr. Brigham;
r. Records of Catawba Valley Neurosurgical Spine Services, Second Opinion; and,
s. Medication Printout.
8. Defendants have not agreed to pay for psychiatric treatment.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 57 years old, and had completed the eighth grade. He is 5'9" tall and weighs approximately 235 pounds. In 1985, he began working as a pump house operator with the employer. His duties required him to mix finishing materials for employees, keep records of the formulations, keep the area in order, lift 55-gallon drums of finishing materials, and dispose of waste materials.
2. On February 10, 2000, as plaintiff pushed a spray pot on a pair of hand trucks down a ramp, he twisted and felt immediate pain in the middle of his back. By the following day, he felt pain in his groin that continued down his left leg to his left foot.
3. Plaintiff reported his injury to his supervisor and the employer referred him to Dr. David Abernathy.
4. On February 22, 2000, Dr. Abernathy saw plaintiff for complaints of back pain that radiated into the groin area. Dr. Abernathy diagnosed plaintiff with low back pain and issued restrictions of no bending, squatting, kneeling, climbing, twisting or reaching above shoulder level, and gave a ten to twenty pound lifting restriction. Therapy and pain medications were ordered. Plaintiff reported a history of low back pain for five years; prior therapy and x-rays revealed pre-existing degenerative disc disease.
5. Plaintiff continued to work from February 10 2000, until February 25, 2000. He returned to regular work on March 6, 2000, where he continued to work until December 15, 2000. From then until September 16, 2001, plaintiff was out of work while seeing a number of physicians for evaluations and treatment.
6. During follow-up visit on March 17, 2000, Dr. Abernathy's examination found plaintiff to be walking and moving normally, despite complaints of back pain radiating to the left thigh anteriorly. Dr. Abernathy noted he was unable to correlate any of plaintiff's complaints to the lumbar strain. By March 28, 2000, Dr. Abernathy released plaintiff to return to unrestricted work. He also referred plaintiff to Dr. Jeffrey Knapp of Hickory Orthopedic Center, due to the pain complaints.
7. On March 30, 2000, Dr. Knapp evaluated plaintiff for the persistent left leg pain radiating to the knee. Dr. Knapp diagnosed plaintiff with lumbar radiculopathy, ordered an MRI, and released plaintiff to return to work with no bending and a ten-pound maximum lifting limit.
8. The MRI revealed multi-level disc degeneration with mild L2-3 and L3-4 symmetric disk bulges. Dr. Knapp ordered epidural injections, anti-inflammatory medications and a ten-pound lifting limit, for the degenerative disc disease of the lumbar spine with radiculopathy.
9. On May 17, 2000, an EMG and nerve conduction studies revealed peripheral neuropathy with both axonal and demylination in upper and lower limbs. The peripheral neuropathy was not indicative of nerve compression or disc herniation. There was no evidence of active lumbar radiculopathy on the left.
10. Neurologist Dr. Dale Menard examined plaintiff on June 22, 2000, at which time he noted plaintiff had a significant family history of diabetes. Dr. Menard diagnosed plaintiff with myalgia paresthetica, for which he prescribed Neurotin and pain management. Dr. Menard also referred plaintiff to the Neurology Department at Wake Forest University Baptist Medical Center.
11. Plaintiff received pain treatment at Unifour Pain Treatment Center beginning on July 14, 2000. Dr. Christopher Hunt diagnosed plaintiff with thigh pain of unclear etiology. There was no evidence of lumbar radiculopathy. Plaintiff did not express any anxiety or depression. Myalgia paresthica was suspected. By December 13, 2000, plaintiff began reporting a tingling pain and electrical-type sensation down the calf into the bottom of the foot. Then, Dr. Hunt diagnosed plaintiff with diabetic neuropathy. Dr. Hunt prescribed Oxycontin.
12. By December 13, 2000, plaintiff complained of tingling and electric-type sensations into his calf to the bottom of his foot. Dr. Hunt then diagnosed plaintiff with diabetic neuropathy.
13. Neurology specialist Dr. James Caress of Wake Forest University Baptist Medical Center Neurology Department evaluated plaintiff on March 21, 2001, upon Dr. Menard's referral. He noted plaintiff had been diagnosed with diabetes mellitus type II. Dr. Caress found it safe for plaintiff to return to work. He further disagreed with Dr. Menard's diagnosis due to lack of findings to support the diagnosis. Dr. Caress ordered a myelogram and CT myelogram.
14. On March 23, 2001, neurologist Dr. Dale Menard ordered additional diagnostic studies. A lumbar CT scan and myelogram, which showed degenerative disc disease with possible nerve encroachment at L2-3 and L3-4.
15. Board certified physical medicine and rehabilitation specialist Dr. Leonard Tananis began treating plaintiff on July 9, 2001.
16. On July 26, 2001, neurosurgeon Dr. Gregory Rosenfeld evaluated plaintiff on a surgical opinion by referral of Dr. Menard. He found no evidence of atrophy, full range of motion, normal motor examination, and no evidence of lumbar radiculopathy. Dr. Rosenfeld recommended pain management but no further diagnostic tests. He found plaintiff had reached maximum medical improvement from the lumbar strain and did not assign any permanent impairment rating. Dr. Rosenfeld disagreed with Dr. Menard's diagnosis of myalgia paresthesis, based on plaintiffs' symptoms.
17. Between July 26 and October 4, 2001, private investigators conducted surveillance of plaintiff, during which he was seen capable of moving a porch swing set and lawn mower attachment, rolling a disk, and dragging a cultivator for lawn work. Although plaintiff was seen limping upon leaving work and using a cane at that time, he did not walk with the same gait in other settings, nor was the cane present.
18. Beginning in August 2001, plaintiff participated in therapy and work hardening at Burke Rehabilitation Center.
19. Dr. Tananis released plaintiff to transition to light work for one week beginning September 10, 2001, with ten hours the first week, fifteen hours the second week, and twenty hours the third week. Dr. Tananis restricted plaintiff to no lifting more than twenty pounds and no repetitive bending or stooping. Plaintiff had been instructed to use a cane to support his left leg.
20. Defendant provided a job spraying furniture, which was approved by Dr. Tananis as suitable to plaintiff's restrictions.
21. On September 17, 2001, plaintiff returned to work on a two-hour per day basis, consistent with Dr. Tananis' orders. Defendant paid plaintiff temporary partial disability benefits upon his return to work. After four hours of work, plaintiff requested to go home due to pain.
22. Following an October 8, 2001, evaluation, Dr. Tananis noted plaintiff showing mildly exaggerated pain responses. Dr. Tananis continued plaintiff on the twenty-hour per week work schedule, due to plaintiff's pain complaints.
23. On December 4, 2001, Dr. Tananis found plaintiff had reached maximum medical improvement from the lumbar strain. He referred plaintiff for an evaluation of the left hip due to complaints of pain.
24. The evidence of record supports, and the Full Commission finds as fact, that plaintiff's left groin and low back pain are secondary to arthritis of the left acetabulum, and thus unrelated to the compensable lumbar strain.
25. In January 2002, plaintiff's former counsel Lyndon Helton filed a Motion to Compel Defendant to Provide a Surgical Evaluation. Defense counsel filed a response on or about January 21, 2002, which chronicled the many evaluations, tests and treatment plaintiff had been provided. By Order filed on March 22, 2002, plaintiff's motion was denied, and it was noted therein that plaintiff had already received multiple evaluations from numerous specialists who had found plaintiff did not need surgery.
26. Dr. Tananis referred plaintiff for an orthopedic evaluation. On April 29, 2002, orthopedist Dr. Jeffrey Mokris evaluated plaintiff's left hip and found his symptoms to be out of proportion to the results. Dr. Mokris found no pathology in the hip to explain the symptoms of which plaintiff complained.
27. On May 6, 2002, Dr. Tananis found plaintiff had reached maximum medical improvement and retained an eight percent (8%) permanent partial impairment to his back as a result of the lumbar strain. However, the Full Commission gives little weight to Dr. Tananis' opinion, as there is no evidence the rating was causally related to the back strain, and there is no evidence plaintiff experienced any recurrence of back pain from the lumbar strain. Rather, the competent evidence of record supports, and the Full Commission finds as fact, that plaintiff's pain complaints for which Dr. Tananis provided treatment were due to the arthritic hip or periphoral neuropathy that were unrelated to the compensable injury.
28. As of May 6, 2002, Dr. Tananis continued the permanent twenty-hour per week work restrictions, due to plaintiff's pain complaints. In his deposition, Dr. Tananis elaborated that he had to order plaintiff to at least half-time work to prevent him from adopting a completely sedentary lifestyle and becoming totally deconditioned. He found plaintiff to exhibit exaggerated pain responses and inappropriate facial grimacing, which are a potential sign of psychogenic overlay to pain complaints.
29. On July 2002, Attorney Duncan filed a Motion with the Commission for a second opinion by a physician of plaintiff's choosing. Defense counsel filed a litany of medical evaluations that plaintiff had undergone, and requested authorization to have plaintiff submit to a comprehensive independent medical evaluation by Dr. Craig Brigham, a spine specialist with the Miller Clinic. By Order filed on August 6, 2002, the Commission authorized plaintiff to seek a second opinion by a physician of his choosing and ordered defendant to authorize an evaluation with Dr. Craig Brigham.
30. On August 15, 2002, orthopedic spine specialist Dr. Craig Brigham performed a comprehensive second opinion. On examination, plaintiff had exaggerated illness behavior, wincing with pain whenever he moved or changed position. Based upon the evaluation and review of records, Dr. Brigham formed the impression plaintiff had back pain with some referred leg symptoms with a sense of disability and pain out of proportion to objective findings and mechanism of injury. There was no evidence of nerve root compression. Based upon the examination, Dr. Brigham found no reason for plaintiff to have any permanent restrictions.
31. Dr. Brigham opined, and the Full Commission finds as fact, that there was insufficient medical evidence to support Dr. Menard's initial diagnosis of myalgia.
32. On August 26, 2002, orthopedist Dr. Scott McCloskey evaluated plaintiff on referral of Attorney Duncan. Prior to the evaluation, Dr. McCloskey reviewed the treatment records and tests from the numerous physicians who had seen plaintiff. On examination, there were no signs of atrophy. Dr. McCloskey recommended another MRI and possibly a repeat myelogram and post — myelogram CT scan. Due to the inconsistencies between plaintiff's complaints and the doctor's examination, Dr. McCloskey advised plaintiff that he was perplexed at knowing what was wrong with plaintiff.
33. In additional surveillance of plaintiff on November 22 and 23, 2002, he was carrying groceries and loading them into his car. At 7:00 a.m., he was seen going to yard sales. In total, he went to five yard sales and then to eat. Plaintiff did not exhibit a limp or any difficulty walking during this time. He was capable of getting in and out of his vehicle with no difficulty.
34. By Motion filed on December 4, 2002, plaintiff's counsel requested an order directing defendant to provide a repeat myelogram and post-myelogram CT. Defense counsel filed a Response on December 22, 2002, noting defendant provided an MRI, which was performed on September 30, 2002, showing no evidence of disk herniation but only the same findings as in a prior MRI of degenerative disk disease. On February 4, 2003, plaintiff's motion for a repeat myelogram and post-myelogram CT scan was referred from the Executive Secretary to Deputy Commissioner Amy Pfeiffer. By Order filed on February 21, 2003, Deputy Commissioner Pfeiffer denied plaintiff's motion.
35. Under surveillance, plaintiff walked with no apparent difficulty or limp; engaged in frequent bending and squatting; bent to work under the hood of his truck; moved items and large pieces of equipment from his yard to a tool shed; used a riding mower to mow his yard; and lifted and moved a bicycle and large porch swing. Plaintiff was also personally observed by a coworker at a church yard sale in which he lifted a bicycle and carried it up twelve to fifteen steps with no apparent difficulty. He apparently loaded the item into his vehicle to take it home.
36. By December 12, 2002, Dr. Tananis reviewed EMG and nerve conduction studies, which showed severe peripheral neuropathy. Dr. Tananis recommended plaintiff seek psychological counseling for assistance in dealing with his pain. There is no evidence this condition or the pain for which plaintiff may require counseling was causally related to the lumbar strain.
37. On April 8, 2003, Dr. Andrea Stutesman reviewed plaintiff's medical treatment records and performed an independent medical evaluation. She noted as significant history that plaintiff had unrelated recurrent bladder cancer, non-insulin dependent diabetes mellitus, left meralgia paresthetica secondary to diabetes, peripheral neuropathy secondary to diabetes, lumbar degenerative disc disease, left hip arthritis, hearing loss, and tight iliopsoas, quadriceps and hamstring muscles. Dr. Stutesman recommended plaintiff discontinue Oxycontin and change to Percocet, and that plaintiff discontinue Vicodin and continue Ambien and Skelaxin. During the exam, plaintiff complained of stabbing pain in the lower back, stabbing and throbbing of the left medial and lateral thigh to the knee, burning down the left leg to the foot, and numbness of both feet. The evidence of record is insufficient to show that these conditions are causally related to the compensable lumbar strain.
38. Plaintiff has been seen and treated by Dr. Abernathy, Dr. Menard, Dr. Caress, Dr. James Stutesman, Dr. Knapp, Dr. Mokris, Dr. Brigham, Dr. Rosenfeld, Dr. McCloskey, Dr. Tananis, Dr. Hunt, and plaintiff's family doctor, as well as having two sets of nerve conduction and EMG studies and two MRIs. In addition, plaintiff received physical therapy and work hardening and an evaluation by Dr. Stutesman. Therefore, there is no evidence plaintiff would benefit from any additional diagnostic studies or treatment for the lumbar strain.
39. Plaintiff reached maximum medical improvement on March 28, 2000.
40. Plaintiff retains no permanent impairment as a result of the compensable injury.
41. The Industrial Commission's Rating Guide directs the physician to rate injuries according to the percentage of impairment of the affected part. Using the Rating Guide, the doctor determines the percentage if a given system or member is impaired.
42. Under the Rating Guide, permanent impairments of the spine may be assigned for lumbar spine fractures or intervertebral discs. Episodes of back and leg pain without neurological defect are to be assigned a zero percent impairment. Recurrent episodes of back and leg pain without neurological defect are eligible to be assigned five to ten percent impairment.
43. There is no competent medical evidence to support a finding that any work restrictions assigned after March 28, 2000, were causally related to the compensable lumbar strain.
44. There is insufficient competent medical evidence to support a finding that plaintiff's diabetes, peripheral neuropathy, left leg thigh and groin symptoms are causally related to the compensable back strain.
45. There is insufficient competent evidence in the record to support a finding that any of plaintiff's present symptoms are causally related to the compensable lumbar strain. Furthermore, there is insufficient evidence that plaintiff requires surgery, additional treatment or testing as a result of the compensable back strain.
46. Although plaintiff received numerous examinations, treatment and testing after he reached maximum medical improvement, there is insufficient competent evidence that this additional treatment was reasonably necessary as a result of the lumbar strain. Rather, the competent medical evidence supports a finding that exhaustive treatment and testing was causally related to the diabetes, diabetic peripheral neuropathy, and pre-existing arthritic hip.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). Plaintiff has failed to prove by competent evidence the conditions for which he has sought extensive evaluation and treatment are causally related to the compensable lumbar strain. Therefore, he is not entitled to additional medical or indemnity benefits. Id.
2. Because plaintiff is not prevented by his compensable injury from earning wages, he is not entitled to additional indemnity benefits for temporary disability under N.C. Gen. Stat. §§ 97-29 or 97-30. Knight v. Wal-Mart Stores, 149 N.C. App. 1,562 S.E.2d 434 (2002), aff'd, 357 N.C. 44, 577 S.E.2d 620 (2003).
3. Defendants have paid for authorized medical treatment, including the extensive evaluations and testing that were necessary to provide relief, effect a cure, or lessen plaintiff's period of disability. There is no evidence plaintiff requires any further treatment for the lumbar strain. N.C. Gen. Stat. §97-2(19).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for additional temporary disability benefits is, and under the law must be, DENIED.
2. Plaintiff's claim for permanent partial disability compensation is, and under the law must be, DENIED.
3. Plaintiff's claim for additional medical treatment or testing is, and under the law must be, DENIED.
4. Plaintiff's claim for payment of unpaid medical expenses is, and under the law must be, DENIED.
5. Defendants shall pay an expert witness fee of $450.00 to Dr. Leonard Tananis.
6. Defendant shall pay the costs due the Industrial Commission.
This 8th day of April 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER