***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Griffin with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3.All parties have been properly designated and there is no question as to mis-joinder or non-joinder of parties.
3. 
 4.4. An employment relationship existed between plaintiff and defendant-employer on or about September 4, 2002.
T5. Plaintiff developed bilateral carpal tunnel syndrome on or about September 4, 2002, which was accepted as compensable by defendants. Plaintiff's average weekly wage was $290.61, which yields a compensation rate of $193.75.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
FINDINGS OF FACT
1. Medically, iIn November of 2002,pPlaintiff underwent nNerve cConductionsStudies, which were abnormal and showed evidence of carpal tunnel syndrome in both hands. Defendants accepted plaintiff's bilateral carpal tunnel syndrome as compensable by filing a Form 60 in January 2003.On December 27, 2002, Plaintiff underwent a right carpal tunnel releaseby Dr. Kevin Supple of Greensboro Orthopaedic Center performed rightcarpal tunnel release on plaintiff on December 27, 200,2 which was followed by physical therapy for the right wrist. On March 27, 2003,pPlaintiff underwent a left carpal tunnel release, which was followed by physical therapy for her left wrist.
2. On July 7, 2003, plaintiff was released to return to regular-duty work at two (2) hours per day. Following her return to work, she continued to complain of left arm problems that she claimed were exacerbated by her work duties. Repeat nNervecConduction sStudies performed on *Page 3 
August 6, 2003, were abnormal for the right and left wrists.Because o. Due tof her continued complaints of pain with work, she was referred for a Functional Capacity Evaluation (hereinafter "FCE").
3. Per the September 3, 2003 FCE, pPlaintiff has work restrictions of no lifting over twenty-five (25 ) pounds from the floor, no lifting greater than fifteen (15) pounds to shoulder/overhead level, and no carrying greater than fifteen (15) pounds. Further,pPlaintiff is restricted from repetitive and sustained forward and overhead reaching, fine object manipulation, light grasping, and firm grasping limited to an occasional basis.
4. Plaintiff did exhibit sub-maximal effort throughout the FCE, so the examiner felt pPlaintiff would be capable of performing at a higher level. Upon review of the FCE, Dr. Supple agreedpPlaintiff was capable of performing at a higher level than the FCE showed. Thus, at a minimum pPlaintiff should be able to perform a job within her FCE guidelines.
T5. On September 11, 2003, Dr. Supple releasedpPlaintiff at maximum medical improvement with a five percent(5%) permanent partial impairment rating to both hands. Dr. Supple also released Plaintiff her to return to work within the FCE limitations.
6. On July 9, 2004, vVocational rehabilitation was initiated forpPlaintiff with Mr. George Lentz, a vocational case manager. In February of 2005, Dr. Supple approved a job with Staff Masters; however, pPlaintiff did not apply for the job until approximately three weeks after Mr. Lentz referred the job topPlaintiff. By that time, the position had been filled.
7. on July 9, 2004. Plaintiff did not fully comply with vocationalrehabilitation, thus the Defendants had to filefiled a Motion to Compel Compliance with Vocational Rehabilitation on May 13, 2005due to plaintiff's failure to fully comply with vocationalrehabilitation. Executive Secretary Tracey H. Weaver issued an Order on June 28, 2005, compelling pPlaintiff to comply with vocational rehabilitation pursuant to N.C. Gen. Stat. § 97-25. *Page 4 
8. On June 20, 2005, pPlaintiff was placed in a job with YCCF in a part-time capacity. However, the job was scheduled to convert to full-time employment after a training period elapsed. This job was not temporary in nature, and would have transitioned to permanent had plaintiff continued with YCCF. Plaintiff would have also made more than her pre-injury average weekly wage if she had continued in the position.
9. The fundraiser job was light duty work well withinpPlaintiff's work restrictions. As a fundraiser,pPlaintiff was required to call people and ask for donations. She was allowed to wear a headset so that she did not have to hold the phone to her ear. The only time she had to use her hands was to dial the telephone number and, if she elicited a donation, she only had to write down the phone number of the person giving the donation, the amount of the donation and the cumulative total of donations.
10. Plaintiff's treating physician, Dr. Supple, was provided with a copy of the job description for the fundraiser position with YCCF
,. O and on June 29, 2005, Dr. Supplehe opined that it was "a sedentary work position with a minimal amount of standing, walking, and a minimum amount of repetitive hand use and I do believe falls within the guidelines that had been established based on Ms. Holt's Functional Capacity Evaluation." Dr. Supple approved the fundraising job as acceptable.
11. Plaintiff accepted the position and began working on a part-time basis at YCCF on June 20, 2005. At the same time, plaintiff was enrolled in school four days a week, four hours per day, taking classes in an effort to earn her high school equivalency certificate.
12. In September of 2005, plaintiff returned to Dr. Supple with complaints of increased pain. Although Dr. Supple did not see anything objective upon his examination that would lead him to conclude the fundraising position should have been causing an exacerbation inpPlaintiff's *Page 5 
symptoms, Dr. Supple indicated that the job at YCCF was exacerbating plaintiff's symptoms. However, his opinion was based on misrepresentations plaintiff made during her medical exam. Plaintiff failed to inform Dr. Supple that she was also in class four 4 hours per day. Plaintiff also incorrectly informed Dr. Supple that her job as a fundraiser required her to make 45 calls per hour and to key the pad of the telephone repetitively. However, Mr. William Cassidy, plaintiff's supervisor at YCCF, testified and the Full Commission finds thatpPlaintiff made about forty-five45 calls per shift, which equates to approximately 10-12 calls per hour. Upon receiving the correct information regarding plaintiff's job duties, Dr. Supple agreed that dialing ten10 to twelve 12 phone numbers over the course of aone hour1-hour period was not what he considered to be repetitive work.
13. During his deposition, Dr. Supple was shown a production sheet from pPlaintiff's work on July 7 and July 11, 2005, which documented exactly the amount of writing she had to do at the fundraising position. Dr. SuppleHe agreed that what plaintiff had to write during a four-4-hour work shift was minimal. He also agreed that she did not have to do any repetitive writing and that nothing related to the fundraiser position fell outside ofpPlaintiff's work restrictions. Dr. Supple opined that the fundraising job was suitable and a very appropriate position for someone with plaintiff's restrictions.
14. PPlaintiff underwent an examination with Dr. John Graves on May 16, 2006. At his deposition, Dr. Graves testified that in his opinion the job at YCCF was reasonable employment forpPlaintiff. Further, he agreed that the fundraiser job fell with the FCE guidelines.
15. The only evidence showing pPlaintiff cannot perform the fundraiser job is pPlaintiff's subjective complaints of pain, which are not credible. Plaintiff misrepresented the requirements of the fundraiser job to Dr. Supple. Further, Dr. Supple agreed it was strange that pPlaintiff could continue to work in the GED program after she left the fundraising position, given *Page 6 
that her work in the GED program would have required the use of her hands. Dr. Supple also felt that pPlaintiff's complaints tended to be beyond what he typically expected to see in comparison with her clinical examination.
16. Plaintiff presented a note to Mr. Cassidy indicating Dr. Supple's opinion that the fundraising position was exacerbating her symptoms. As YCCF had no alternative positions available to plaintiff, her employment with YCCF ended. Mr. Cassidy testified thatpPlaintiff's employment would have continued but for her claim that the position exacerbated her symptoms, that he saw the potential forpPlaintiff to become a full-time employee and thatpPlaintiff was eligible for rehire.
Plaintiff unjustifiably refused suitable employment as a fundraiser at YCCF. The greater weight of the credible, objective evidence shows thatplaintiff was capable of performing the duties required of her in the fundraiser job at YCCF. PPlaintiff's misrepresentation to both Dr. Supple and her employer regarding her ability to perform the work amounts to a constructive refusal of suitable employment.
18. After ceasing her employment with YCCF, vocational rehabilitation activities continued with Mr. Lentz. On September 2, 2005, Mr. Lentz identified a position with the Muscular Dystrophy Association (hereinafter "MDA"). Plaintiff was instructed to apply for that position on September 7, 2005. P -Plaintiff represented that when she contacted MDA on September 22, 2005, she was told there were no more job openings. However, Mr. Lentz contacted MDA on several occasions from September 22, 2005, and the date of his report of October 13 and was told that openings at the company did still exist.
19. On October 13, 2005, pPlaintiff was informed of an opportunity for a telemarketing job at Rain Soft, which merely required her to set appointments for the company, and no selling *Page 7 
of their product. — Mr. Lentz informed pPlaintiff to apply in person. Instead, pPlaintiff called and informed the interviewer she could not do the job because it required her to push buttons.Plaintiff has never been told by aA medical provider has never toldplaintiff that she could not push buttons.
20. Plaintiff was enrolled in classes in an effort to obtain her high school equivalency certificate. While plaintiff was enrolled in classes, she was only required to complete one day of job search per week. Plaintiff completed her high school equivalency classes in November 2005. However, plaintiff failed to inform Mr. Lentz that she was no longer taking classes until December 22, 2005. From late November untilher confession of having completedcompletion of the GED program, she plaintiff had continued to only complete one day of job search per week, despite having all week free to search for jobs on a full-time basis.
21. In late January or early February 2006, plaintiff interviewed for two jobs available through a facility services company called the Budd Group. Plaintiff was interviewed by the operations manager, Homer Haithcock. The positions were available on a full-time basis and paid at least $8.00 per hour. (Haithcock Dep. p. 10.)
22. The security officer position located at Randolph Hospital was a light duty job within pPlaintiff's restrictions. The security officer position required "general security duties, also doing fire watch, doing clock rounds, responding to emergency situations in the hospital, assisting with patients as needed, things of that nature."
23. Dr. Supple reviewed the job description for the security position at Randolph Hospital and. He agreed it would appear to fall within the FCE guidelines. Although there was some concern about a 22pound22-pound CO2 fire extinguisher being out ofpPlaintiff's work restrictions, Dr. Graves testified that the position was still reasonable and appropriate since uPlaintiff would only have to use the fire extinguisher during the rare event of a fire occurring in the computer lab or *Page 8 
records section of the hospital. Dr. Graves testified that the security guard position at Randolph Hospital would have been reasonable employment for pPlaintiff. Dr. Graves testified that a job like the security guard position at Randolph Hospital is a gift for a patient that has carpal tunnel syndrome.
24. When discussing the security officer position,pPlaintiff told Mr. Haithcock that her work restrictions consisted of: "that she couldn't carry a fire extinguisher over fifteen pounds. . . . . .she couldn't do an extended amount of walking, that she had been in a car accident, and that she did not want to work outside the Randolph County/Asheboro area." No physician has restricted plaintiff from driving or working outside of the Randolph County/Asheboro area. Further, plaintiff's inability to walk for an extended period of time was due to an injury plaintiff sustained in an unrelated motor vehicle accident.
25. Mr. Haithcock recalls Pplaintiff being an acceptable, qualified candidate for the security officer position, yet he was unable to offer her the job due to the work restrictions she relayed during the interview. More likely than not, pPlaintiff would have been able to obtain the job had she not misrepresented her work restrictions and if she had diligently sought the job.
26. Mr. Haithcock also brought up the possibility of another available office job at the Lincoln Financial Building in downtown Greensboro, that did not require any lifting or walking. This job was also a light duty position within pPlaintiff's work restrictions and FCE guidelines. However, plaintiff refused the position because she did not want to work outside of the Randolph county/Asheboro area. Both Dr. Supple and Dr. Graves testified that the job would have more than likely been within pPlaintiff's work restrictions. —
27. Plaintiff rejected any possible job outside of Randolph County, as she stated she did not want to drive to any other county. — Mr. Haithcock testified that he would have offered *Page 9 pPlaintiff this job were it not for the fact that she told him she could not work outside of Randolph County. -
28. The greater weight of the evidence shows that either position with he Budd Group would have been available topPlaintiff had she diligently sought it and that either position would have been suitable employment withinpPlaintiff's work restrictions. It was not unreasonable to expect plaintiff to seek work in the Greensboro area as this area is part of plaintiff's labor market area identified by Mr. Lentz. Defendants voluntarily paid approximately $8,000.00 to repair plaintiff's automobile so that she would have reliable transportation. Also, plaintiff's previous position with YCCF was located in Greensboro and she had voiced no complaints about its location and her ability to get to work.
29. After plaintiff left her position with YCCF, she applied for jobs that consisted of clerks and cashiers at retail stores and fast food restaurants. Dr. Supple and Mr. Lentz both testified that those positions required repetitive hand manipulation and that these positions were not suitable considering plaintiff's restrictions.
30. Despite an Order compelling with to comply with vocational rehabilitation, plaintiff has not been fully cooperative with the reasonable vocational rehabilitation efforts made by defendants. Furthermore, plaintiff has failed to make a reasonable effort to look for work.
-31. On September 12, 2005, Plaintiff's was last seen by Dr. Supplesaw plaintiff on September 12, 2005for the last time. At that time, Dr. Supple did not recommend any additional treatment, nor didpPlaintiff request any further medical treatment. Following that medical appointment, pPlaintiff did not contact Dr. Supple's office to request any additional treatment or medications.-
32. On January 9, 2006, defendants scheduledpPlaintiff to be seen for an independent medical evaluation with Dr. Allen Bartko on January 9, 2006. However,pPlaintiff informed defendants that she *Page 10 
would not attend the examination, which forceddDefendants to file a Motion to Compel Compliance with Medical Treatment on January 9, 2006. — Plaintiff did not file a response, but, instead, an objection to dDefendants' Motion was filed on January 19, 2006. Plaintiff objected to attending the appointment with Dr. Bartko, even though pPlaintiff had filed a hearing request seeking additional medical treatment, and had been released by Dr. Supple. — Executive Secretary Tracey H. Weaver issued an Order on March 23, 2006, compelling pPlaintiff to fully comply with medical treatment and to present for the next appointment scheduled by defendants.
33. On May 16, 2006, Dr. John Graves examinedPplaintiff. was examined by Dr. John Graves on May16, 2006. — After his examination, Dr. Graves did make some treatment recommendations due to pPlaintiff's subjective complaints of pain.However, fFollowing this appointment,pPlaintiff never requested to return to Dr. Graves for treatment, nor did she request authorization for any of the treatment suggestions given by Dr. Graves. — In fact, pPlaintiff has not requested authorization to return to see any physician regarding her carpal tunnel syndrome.
34. P34. If Plaintiff needed additional medical treatment it seemsmore likely than not that she would request it and accept it whenoffered. However, Plaintiff has done neither. Therefore, P laintiff reached maximum medical improvement on September 11, 2003.
35. On February 23, 2006, defendants filed a Form 24 Application to Terminate Payment of Compensation based upon plaintiff's failure to accept suitable work and refusal to cooperate with vocational rehabilitation despite an Order compelling her compliance. On April 11, 2006, Special Deputy Commissioner Henderson approved defendants' Form 24 Application, suspending plaintiff's benefits effective February 23, 2006. Pursuant to this Order, defendants suspended plaintiff's benefits on April 11, 2006.
36. A five percent (5% ) permanent partial impairment rating to each hand would entitle pPlaintiff to an additionaltwenty 20 weeks of benefits, which is worthequals $3,875.00.
36 . Plaintiff continued to receive indemnity benefits after reaching maximum medical improvement on September 11, 2003 until *Page 11 
her benefits were suspended by the Industrial Commission on April 11, 2006. Thus, pPlaintiff received approximately twenty-137 nine weeks of benefits after reaching maximum medical improvement. Plaintiff made no election to receive temporary total disability benefits in lieu of benefits for her permanent partial impairment ratings.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence shows thatpPlaintiff has unjustifiably refused to cooperate with the reasonable vocational rehabilitation efforts by defendants and as such, defendants' Form 24 Application is approved. Defendants were entitled to suspend medical and indemnity compensation effective February 23, 2006. N.C. Gen. Stat. § 97-25.The Order entered by Special Deputy CommissionerHenderson on April 11, 2006 is affirmed. N.C. Gen. Stat. § 97-25.
2. Defendants admitted the compensability of plaintiff's injury by accident in January 2003 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277 (2001).
3. In order to meet the burden of proving continuing disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable *Page 12 
effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
In the case at hand, plaintiff has not met her burden of proving continuing disability under the first, third, or fourth prongs of theRussell test. Further, plaintiff has failed to prove continuing disability under the second prong of the Russell test as the evidence shows that plaintiff has not made a reasonable effort to obtain employment. Id. Furthermore, assuming arguendo, that plaintiff had met her burden, defendants have produced evidence that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job. Id.
5. Plaintiff has not made an election of benefits and is entitled to elect the more munificent remedy. Pursuant to N.C. Gen. Stat. § 97-31, plaintiff sustained a 5% permanent partial impairment to both hands entitling her to permanent partial disability compensation at the rate of $193.75 per week for 20 weeks. N.C. Gen. Stat. § 97-31; Knight v.Wal-Mart Stores, 149 N.C. App. 1, 562 S.E.2d 434 (2002). Plaintiff received temporary total disability benefits under N.C. Gen. Stat. § 97-29 from the time she reached maximum medical improvement on September 11, 2003 until her benefits were suspended on April 11, 2006. Because the temporary total disability benefits plaintiff received are greater than the benefits she is entitled to for her *Page 13 
permanent partial impairment rating, the more munificent remedy to plaintiff are those benefits she received under N.C. Gen. Stat. § 97-29. As such, plaintiff is not entitled to further benefits under N.C. Gen. Stat. § 97-31. Collins v. Speedway Motor Sports Corp.,165 N.C. App. 113, 598 S.E.2d 185 (2004).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's request for additional medical and indemnity compensation is hereby DENIED.
4.2. Each side shall bear its own costs.
This the 14th day of February, 2008.
_____________s/________________
DIANNE C. SELLERS
COMMISSIONER
CONCURRING:
_____________s/________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
_____________s/________________ PAMELA T. YOUNG CHAIR

 *Page 1