***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Phillips with modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The date of the alleged injury in this claim is July 14, 2005.
2. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all relevant times, an employer-employee relationship existed between Plaintiff and Defendant-Employer.
4. At all relevant times, Defendant-Employer regularly employed three or more employees in the State of North Carolina.
5. At all times relevant to this claim, Defendant-Carrier St. Paul Travelers was the carrier on risk for workers' compensation insurance in North Carolina for Defendant-Employer.
 ***********
The following documentary evidence was received by the Deputy Commissioner as:
 EXHIBITS
Stip. Ex. #1: Medical Records and Supplement;
Stip. Ex. # 2: IC Forms;
Stip. Ex. # 3: Plaintiff's Disc. Resp.;
Stip. Ex. # 4: Defendant's Disc. Resp.; and
Stip. Ex. # 5: Letter from Michelle Jones.
 *********** ISSUES *Page 3 
1. Whether Plaintiff sustained an injury by accident and if so, to what benefits is she entitled;
2. Whether Defendants must reimburse Plaintiff's Group Health Insurance Carrier pursuant to N.C. Gen. Stat. § 97-90.1; and
3. What is Plaintiff's average weekly wage.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was fifty-six years old. Plaintiff has a degree in Interior Design and has been an Interior Designer for over twenty years. For approximately nine years, Plaintiff worked for Defendant-Employer in Oklahoma. After her husband passed away, however, she moved to Charlotte and worked in Defendant-Employer's location there for approximately two years.
2. Plaintiff had a number of pre-existing medical conditions, including (1) foot surgery for plantar fasciitis in 2002, (2) a soft-tissue whiplash or shoulder injury from a motor vehicle accident in 1990, (3) a hand injury from another motor vehicle accident in 1993, and (4) a minor and relatively insignificant work-related injury to her left hand with Defendant-Employer while working in Oklahoma. Plaintiff also had eye surgery at some point after July 14, 2005. None of these pre-existing conditions are relevant to Plaintiff's injuries in the present case. Plaintiff had no pain, diagnoses, or treatment to either of her knees before July 14, 2005. All of Plaintiff's medical records fail to record a past medical history for any knee problems before July 14, 2005. *Page 4 
3. On Thursday, July 14, 2005, Plaintiff was working for Defendant-Employer and retrieving some fabric for a client from the warehouse when her left foot got wedged between two boxes unexpectedly. Plaintiff twisted her left leg and fell forward. Her left knee hurt immediately. Plaintiff did not report the injury immediately to Defendant-Employer because she thought she would get better. Plaintiff was scheduled to go to Kiawah Island during the week following July 14, 2005. Plaintiff's left knee pain continued to grow worse during this vacation.
4. On July 26, 2005, after returning from Kiawah Island, Plaintiff saw Dr. Hal Armistead, D.O. at Northcross Urgent Care. Dr. Armistead reported that Plaintiff had pain in her left knee after twisting it at work on July 14, 2005. He ordered x-rays of Plaintiff's knee, and the x-ray report indicated a clinical history that Plaintiff had twisted her knee two weeks prior, with persistent pain and swelling. Dr. Armistead also documented the work-related origin of Plaintiff's knee condition in a work restriction note, in which he limited Plaintiff from (1) lifting more than ten pounds, (2) any stooping, (3) any bending, and (4) any twisting, and from anything but ground-level work with only minimal (1) pushing, (2) pulling, (3) carrying, (4) throwing, (5) walking, (6) standing, (7) climbing, or (8) kneeling. Any violation of these work restrictions placed Plaintiff at an increased risk of aggravating her knee condition. Dr. Armistead prescribed a knee immobilizer (or knee brace) and also referred Plaintiff to another doctor.
5. Plaintiff brought her work restriction note to Michelle Jones, who was her manager at Defendant-Employer, to inform her of the injury and of her doctor's restrictions. However, Defendant-Employer did not accommodate them. In Plaintiff's job as an Interior Designer with Defendant-Employer, she typically had to do considerable walking and stayed on her feet for more than fifteen minutes per hour. She also had to bend (or squat or kneel), lift and *Page 5 
carry objects weighing more than twenty-five pounds, climb ladders, and retrieve materials, fabrics, and supplies out of a storage warehouse.
6. Upon Dr. Armistead's referral, Plaintiff presented to Dr. Joseph Garcia, M.D. on July 27, 2005. Dr. Garcia's records indicate that Plaintiff had twisted her left knee while moving some boxes at work about ten days prior to that visit. Although not a surgeon, Dr. Garcia has had extensive training in orthopedic medicine. Dr. Garcia noted effusion in Plaintiff's left knee, and he was suspicious of a meniscal tear. He ordered an MRI, which revealed a small Baker's cyst, some patella tendonitis with degeneration of the medial meniscus, but no apparent tear. Still, Dr. Garcia characterized the MRI findings as abnormal compared to the amount of degeneration normally found in other people of Plaintiff's age. The MRI report indicated that the reason for taking the MRI was an injury on July 13, 2005.
7. On approximately July 29, 2005, Ms. Jones left a handwritten letter on Plaintiff's desk at Defendant-Employer regarding Plaintiff's work restriction note. The letter stated that "this [work restriction note] is dated 7/26/05. You informed me of the injury on 7/29/05. . . . this is not covered under worker's comp. . . . You have to report the incident within 24 hours to be covered." Ms. Jones' handwritten letter fails to mention anything about a knee brace, a knee immobilizer, a vacation, or any of Plaintiff's pre-existing medical conditions. Because Ms. Jones had denied Plaintiff's workers' compensation claim, Plaintiff placed her continuing treatment under her group health coverage. Plaintiff did not receive any Form 61 Denial or any other indication that her workers' compensation had been denied from her employer's insurance carrier.
8. Plaintiff continued to work after returning from Kiawah Island and, on occasion, wore the knee immobilizer prescribed by Dr. Armistead while working. On August 3, 2005, *Page 6 
however, Dr. Garcia removed Plaintiff from all work for four days because her work activities were aggravating her knee pain. On August 10, 2005, Dr. Garcia referred Plaintiff to an orthopedic surgeon after her left knee continued to crack and pop. Consequently, Plaintiff first saw Dr. Christopher Bensen, M.D. on August 18, 2005.
9. Dr. Bensen's first medical record indicates a "4-5 week history of pain in the posterior aspect of [Plaintiff's] knee. This started following an injury at work when she got her foot wedged between two boxes of fabric, twisting her knee." On physical examination of Plaintiff, Dr. Bensen noted abnormal findings of a mildly antalgic gait on the left side, some crepitance in her knee, moderate medial joint line tenderness, a positive McMurray's test, and a grade IA Lachman. Dr. Benson opined that Plaintiff's symptoms were caused by her injury at work assuming Plaintiff's report of events were credible.
10. On September 13, 2005, Defendants filed a Form 61 Denial indicating that the basis of denial was Plaintiff's not returning a signed medical authorization sheet and medical records from all treating physicians." This Form 61 was signed by Defendant-Carrier's Claims Adjuster. However, Plaintiff did not receive any medical authorization from Defendants before this denial, and she did not receive a copy of the Form 61.
11. On October 21, 2005, Defendants filed another Form 61 indicating that the basis of denial was Plaintiff's not returning a signed medical authorization. This Form 61 was unsigned. However, there is no evidence that Plaintiff received any medical authorizations from Defendants before this time.
12. Defendant-Employer disciplined Plaintiff because of absences at work around November 17, 2005. On that date, Ms. Jones issued a "Corrective Action Form" that cited Plaintiff for unacceptable levels of productivity and attendance since January 2005. However, *Page 7 
the Corrective Action Form indicated that some of Plaintiff's absences were due to a "medical condition out of my control — injury in warehouse." Furthermore, Ms. Jones subsequently completed a Form 22 Wage Chart and Attendance Record using information from Defendant-Employer's computerized monthly business report, which indicated that Plaintiff had not missed any days from work in the fifty-two weeks preceding July 14, 2005.
13. Plaintiff also saw Dr. Scott Smith, M.D., who is an orthopedic surgeon who practiced with Dr. Bensen. Dr. Smith opined to a reasonable degree of medical certainty based upon Plaintiff's credible report of history, that Plaintiff's injury at work aggravated her underlying degenerative condition. Dr Smith and Dr. Bensen did not believe, however, that Plaintiff needed surgery. On November 29, 2005, Dr. Bensen took Plaintiff completely out of work because of the ongoing symptoms in her left knee.
14. On December 19, 2005, Dr. Smith restricted Plaintiff to sedentary work only with no walking more than fifteen minutes per hour and no bending, stooping, squatting, or kneeling, and no climbing ladders or stairs. Any violation of these restrictions placed Plaintiff at an increased risk of aggravating or worsening her knee condition.
15. Plaintiff worked during all periods in which her doctors allowed her to work. Both before and after May 1, 2006, Plaintiff continued to have the medical restrictions given to her by Dr. Smith and Dr. Bensen. She continued to work at Defendant-Employer even though her normal work activities exceeded those restrictions.
16. On May 1, 2006, Plaintiff voluntarily left Defendant-Employer's Charlotte location and moved to Charleston, South Carolina, to remarry. After the injury on July 14, 2005, Plaintiff states she began to shift her weight from her left side to her right side because of her left knee pain. *Page 8 
17. On August 24, 2006, Plaintiff first saw Dr. Harold Del Schutte, M.D. for her knee pain. Dr. Schutte is a medical professor and Director of the Adult Joint Reconstructive Program at the Medical University of South Carolina in Charleston, South Carolina. Dr. Schutte's first medical record indicated that Plaintiff had had left knee pain since an injury at work in Charlotte, North Carolina, about a year prior to that appointment. Plaintiff's problems at that appointment included ongoing locking and catching, which are mechanical problems, and Dr. Schutte suspected a meniscal tear. X-rays ordered by Dr. Schutte showed joint effusion and degenerative changes in the form of joint space narrowing or thinning of the cartilage in Plaintiff's left knee. Dr. Schutte performed arthroscopic surgery on Plaintiff's left knee on September 7, 2006. Dr. Schutte opined to a reasonable degree of medical certainty that Plaintiff's left knee condition was due to a work-related accident on July 14, 2005, or an aggravation of an underlying degenerative condition by the work-related accident on July 14, 2005.
18. Based upon the totality of the evidence of record, the Full Commission finds that Plaintiff has shown that the more likely and probable cause of her left knee condition is the work-related accident at Defendant-Employer on July 14, 2005, which either caused her underlying pathology entirely or aggravated pre-existing pathology to the extent it became symptomatic.
19. Between May 1, 2006, and December 28, 2006, Plaintiff received unemployment compensation while in South Carolina and looked for other work. She satisfied all of the job search requirements under the law for purposes of receiving unemployment compensation, but did not get hired. Plaintiff was capable of some work between May 1, 2006, and December 28, 2006, and made a reasonable effort to find other work during this period, but without success. On December 28, 2006, Plaintiff returned to work in Charleston, South Carolina. *Page 9 
20. Plaintiff's left knee has continued to hurt since September 2006. Several weeks before May 2007, Plaintiff's right knee started to hurt more. By May 9, 2007, Plaintiff had twisted her right knee and felt a pop. Several days later, her knee popped again when her knee gave way while she was getting into her car.
21. Dr. Schutte was of the opinion, and the Full Commission finds as fact, that Plaintiff's overcompensation of her knees caused problems with Plaintiff's right knee. Dr. Schutte state specifically during deposition: "I have no doubt that her right knee was working hard than her left knee, given that she has arthritis in her left knee and was favoring that knee. And Plaintiff testified that although she had no right knee problems prior to her work-related accident, she began to have right knee problems following the accident. Plaintiff stated at the hearing before the Deputy Commissioner: "[B]ecause I had tried to shelter the left knee so much, I had made my right knee and my right leg bear all the weight." Based upon a review of the record in this matter, the Full Commission finds that the greater weight of the evidence shows that Plaintiff's overcompensation of her right side more than likely caused, contributed to, or aggravated the underlying pathology in Plaintiff's right knee to the point that her right knee became symptomatic.
22. On June 26, 2007, Dr. Schutte performed arthroscopic surgery to Plaintiff's right knee to address the symptoms she had there. Plaintiff missed a week from work before returning to work after this surgery.
23. Plaintiff continues to have swelling and pain in both of her knees, and she takes pain medication on occasion. Despite these problems, Plaintiff has continued to remain gainfully employed and keeps working, except for the periods mentioned elsewhere in these findings of fact. *Page 10 
24. Although Plaintiff would rather not have any more surgeries, Plaintiff is at a greater than fifty percent chance of needing both of her knees replaced in the future because of the symptoms related to her pathology.
25. Plaintiff was paid on a draw-plus-commission basis with Defendant-Employer. However, the terms of her employment with Defendant-Employer indicated that once she was paid either a draw or commission, Defendant-Employer could not recoup the payments, but could only terminate Plaintiff's employment as its recourse for insufficient commissions. Plaintiff had to pay both federal and state taxes on all payments she received, and Defendant-Employer reported the full amount of these payments to both federal and state tax authorities on Plaintiff's W-2 forms. Although Plaintiff was paid on a draw-plus-commission basis, against which any deficit in commissions was applied against future commissions, it is too speculative and impossible to determine the exact work weeks in which Plaintiff actually earned her commissions.
26. In 2004, Plaintiff earned $42,672.60 while working at Defendant-Employer, according to Plaintiff's W-2 form with Defendant-Employer. In 2005, Plaintiff earned $34,975.43 while working at Defendant-Employer, according to Plaintiff's W-2 form with Defendant-Employer. In both of these years, Plaintiff earned a total of $77,648.03.
27. Plaintiff's tax records are the most reliable indicator of her earnings with Defendant-Employer. Using these records are fair and just to both parties, since both Plaintiff and Defendant-Employer are obliged to report accurately the amount of Plaintiff's earnings to both federal and state tax authorities in their tax filings, including Plaintiff's W-2 forms. Dividing $77,638.03 by 705 days [multiplying 365 days by 2 years and then deducting the twenty-five days missed between (1) August 3 and August 7, 2005, and (2) November 29 and *Page 11 
December 19, 2005] and then multiplying the result by seven days produces a figure of $770.97, which the Full Commission finds to be Plaintiff's average weekly wage.
28. Plaintiff has not yet at maximum medical improvement for her injuries.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her left knee arising out of and in the course of her employment on July 14, 2005, which proximately caused plaintiff to develop a compensable right knee injury as a natural consequence of the left knee injury. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to all medical compensation related to her left knee and right knee compensable injuries, including the treatment provided and recommended by Dr. Armistead, Dr. Garcia, Dr. Bensen, Dr. Smith, and Dr. Schutte. N.C. Gen. Stat. §§ 97-2(19), 97-25. Dr. Schutte is authorized to treat Plaintiff for her compensable injuries.
3. Defendants must notify Plaintiff's group health insurance Carriers and Plaintiff's medical providers of this determination of compensability and liability. See
N.C. Gen. Stat. § 97-90.1. Defendants must either (1) reimburse these group health carriers and Plaintiff for their expenses related to Plaintiff's injuries, or (2) pay Plaintiff's medical providers according to the Industrial Commission's fee schedule so that Plaintiff's medical providers can refund any payments to her group health Carriers and to Plaintiff. However, Defendants shall hold Plaintiff harmless against any efforts by her group health insurance carriers to seek reimbursement or credit for any of Plaintiff's injury-related treatment. N.C. Gen. Stat. §§ 97-25, 97-90.1. *Page 12 
4. Plaintiff was totally disabled because of her injury for the four days between August 3, 2005, and August 7, 2005. N.C. Gen. Stat. § 97-29.
5. Plaintiff was totally disabled because of her injury for the twenty-one days between November 29, 2005, and December 19, 2005. N.C. Gen. Stat. § 97-29.
6. Plaintiff was totally disabled because of her injury for the 241 days between May 1, 2006, and December 28, 2006. N.C. Gen. Stat. § 97-29.
7. Plaintiff's average weekly wage has been calculated correctly under the fifth method in N.C. Gen. Stat. § 97-2(5).
8. The issue of permanent partial disability under N.C. Gen. Stat. § 97-31, assuming that this is the more favorable remedy to Plaintiff, is premature until she reaches maximum medical improvement. See Knight v. Wal-Mart Stores,Inc., 149 N.C. 1, 562 S.E.2d 434 (2002), aff'd,357 N.C. 44, 577 S.E.2d 620 (2003) (per curiam).
 ***********
The foregoing Stipulations, Findings of Fact, and Conclusions of Law engender the following:
 AWARD
1. Subject to the attorneys' fee in paragraph 3 below, Defendants shall pay total disability compensation to Plaintiff for a total of 241 days based on an average weekly wage of $770.97, for a total of $17,695.60 (($770.97 x 2/3) x (241 days / 7 days)).
2. Defendants shall authorize and pay for all injury-related medical compensation for Plaintiff's left knee and right knee, including all future treatment recommended by Dr. Schutte. *Page 13 
3. Plaintiff's counsel is entitled to a reasonable attorneys' fee of 25% of all compensation awarded in this Opinion and Award. Defendants shall forward all sums due under this Opinion and Award to Plaintiff's counsel for appropriate disbursement.
4. Defendants shall pay the costs.
This 31st day of July 2008.
S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER