***********
The Court of Appeals, upon review of this matter, held that Plaintiff had not met her burden of showing that her right knee injury was a direct and natural consequence of the compensable left knee injury, and found that the record in the matter was not clear as to the period of time in which Plaintiff was found to be disabled for her compensable left knee injury, holding in pertinent part:
 This case is remanded to the Commission for additional findings of fact resolving the conflicts in the Commission's Opinion and Award. Specifically, the Commission shall determine the date plaintiff left the employ of Ethan Allen in North Carolina, where and when she worked in South Carolina, and the reason for her termination in South Carolina. *Page 2 
Pursuant to the April 7, 2009, Opinion of the Court of Appeals in this case, the Full Commission modifies its May 22, 2008 Opinion and Award in this matter as provided herein.
 *********** RULING ON MOTION FOR EVIDENTIARY HEARING
Plaintiff's counsel, in his Rule 702A brief dated February 5, 2010, requested that the Full Commission "remand the case back to the deputy commissioner section for another evidentiary hearing, given that Plaintiff recently had a total left knee replacement as a consequence of her injury." The Full Commission finds that the issue of Plaintiff's left knee replacement is not properly before the Full Commission at this juncture. The Full Commission hereby denies Plaintiff's motion to remand the case back to the deputy commissioner section, and directs Plaintiff's counsel to file a Form 33 Request that Claim BeAssigned For Hearing with the Commission regarding any controversy between the parties that may have arisen from the issue of Plaintiff's recent total left knee replacement.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The date of the alleged injury in this claim is July 14, 2005.
2. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all relevant times, an employer-employee relationship existed between Plaintiff and Defendant-Employer. *Page 3 
4. At all relevant times, Defendant-Employer regularly employed three or more employees in the State of North Carolina.
5. At all times relevant to this claim, Defendant-Carrier St. Paul Travelers was the carrier on risk for workers' compensation insurance in North Carolina for Defendant-Employer.
 ***********
The following documentary evidence was received by the Deputy Commissioner as:
 EXHIBITS Stip. Ex. #1: Medical Records and Supplement;
 Stip. Ex. # 2: IC Forms;
 Stip. Ex. # 3: Plaintiff's Disc. Resp.;
 Stip. Ex. # 4: Defendant's Disc. Resp.; and
 Stip. Ex. # 5: Letter from Michelle Jones.
 *********** DEPOSITIONS
The following depositions were admitted into the record by the Deputy Commissioner:
 1. Dr. Joseph Garcia, M.D., on October 24, 2007;
 2. Dr. Harold Del Schutte, M.D., on November 2, 2007;
 3. Dr. Christopher Bensen, M.D., on November 12, 2007;
 4. Dr. Scott Smith, M.D., on November 13, 2007; and
 5. Dr. Hal Armistead, D.O., on November 30, 2007.
 *********** ISSUES *Page 4 
1. Whether Plaintiff sustained an injury by accident and if so, to what benefits is she entitled;
2. Whether Defendants must reimburse Plaintiff's Group Health Insurance Carrier pursuant to N.C. Gen. Stat. § 97-90.1; and
3. What is Plaintiff's average weekly wage.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was fifty-six years old. Plaintiff has a degree in Interior Design and has been an Interior Designer for over twenty years. For approximately nine years, Plaintiff worked for Defendant-Employer in Oklahoma. After her husband passed away, Plaintiff moved to Charlotte and worked in Defendant-Employer's location there for approximately two years.
2. Plaintiff had a number of pre-existing medical conditions, including (1) foot surgery for plantar fasciitis in 2002, (2) a soft-tissue whiplash or shoulder injury from a motor vehicle accident in 1990, (3) a hand injury from another motor vehicle accident in 1993, and (4) a minor and relatively insignificant work-related injury to her left hand with Defendant-Employer while working in Oklahoma. Plaintiff also had eye surgery at some point after July 14, 2005. None of these pre-existing conditions are relevant to Plaintiff's injuries in the present case. Plaintiff had no pain, diagnoses, or treatment to either of her knees before July 14, 2005. All of Plaintiff's medical records fail to record a past medical history for any knee problems before July 14, 2005. *Page 5 
3. On Thursday, July 14, 2005, Plaintiff was working for Defendant-Employer and retrieving some fabric for a client from the warehouse when her left foot got wedged between two boxes unexpectedly. Plaintiff twisted her left leg and fell forward. Her left knee hurt immediately. Plaintiff did not report the injury immediately to Defendant-Employer because she thought she would get better. Plaintiff was scheduled to go to Kiawah Island during the week following July 14, 2005. Plaintiff's left knee pain continued to grow worse during this vacation.
4. On July 26, 2005, after returning from Kiawah Island, Plaintiff saw Dr. Hal Armistead, D.O. at Northcross Urgent Care. Dr. Armistead reported that Plaintiff had pain in her left knee after twisting it at work on July 14, 2005. He ordered x-rays of Plaintiff's knee, and the x-ray report indicated a clinical history that Plaintiff had twisted her knee two weeks prior, with persistent pain and swelling. Dr. Armistead also documented the work-related origin of Plaintiff's knee condition in a work restriction note, in which he limited Plaintiff from (1) lifting more than ten pounds, (2) any stooping, (3) any bending, and (4) any twisting, and from anything but ground-level work with only minimal (1) pushing, (2) pulling, (3) carrying, (4) throwing, (5) walking, (6) standing, (7) climbing, or (8) kneeling. Any violation of these work restrictions placed Plaintiff at an increased risk of aggravating her knee condition. Dr. Armistead prescribed a knee immobilizer (or knee brace) and also referred Plaintiff to another doctor.
5. Plaintiff brought her work restriction note to Michelle Jones, who was her manager at Defendant-Employer, to inform her of the injury and of her doctor's restrictions. However, Defendant-Employer did not accommodate them. In Plaintiff's job as an Interior Designer with Defendant-Employer, she typically had to do considerable walking and stayed on her feet for more than fifteen minutes per hour. She also had to bend (or squat or kneel), lift and *Page 6 
carry objects weighing more than twenty-five pounds, climb ladders, and retrieve materials, fabrics, and supplies out of a storage warehouse.
6. Upon Dr. Armistead's referral, Plaintiff presented to Dr. Joseph Garcia, M.D. on July 27, 2005. Dr. Garcia's records indicate that Plaintiff had twisted her left knee while moving some boxes at work about ten days prior to that visit. Although not a surgeon, Dr. Garcia has had extensive training in orthopedic medicine. Dr. Garcia noted effusion in Plaintiff's left knee, and he was suspicious of a meniscal tear. He ordered an MRI, which revealed a small Baker's cyst, some patella tendonitis with degeneration of the medial meniscus, but no apparent tear. Still, Dr. Garcia characterized the MRI findings as abnormal compared to the amount of degeneration normally found in other people of Plaintiff's age. The MRI report indicated that the reason for taking the MRI was an injury on July 13, 2005.
7. On approximately July 29, 2005, Ms. Jones left a handwritten letter on Plaintiff's desk at Defendant-Employer regarding Plaintiff's work restriction note. The letter stated that "this [work restriction note] is dated 7/26/05. You informed me of the injury on 7/29/05. . . . this is not covered under worker's comp. . . . You have to report the incident within 24 hours to be covered." Ms. Jones' handwritten letter fails to mention anything about a knee brace, a knee immobilizer, a vacation, or any of Plaintiff's pre-existing medical conditions. Because Ms. Jones had denied Plaintiff's workers' compensation claim, Plaintiff placed her continuing treatment under her group health coverage. Plaintiff did not receive any Form 61 Denial or any other indication that her workers' compensation had been denied from her employer's insurance carrier.
8. Plaintiff continued to work after returning from Kiawah Island and, on occasion, wore the knee immobilizer prescribed by Dr. Armistead while working. On August 3, 2005, *Page 7 
however, Dr. Garcia removed Plaintiff from all work for four days because her work activities were aggravating her knee pain. On August 10, 2005, Dr. Garcia referred Plaintiff to an orthopedic surgeon after her left knee continued to crack and pop. Consequently, Plaintiff first saw Dr. Christopher Bensen, M.D. on August 18, 2005.
9. Dr. Bensen's first medical record indicates a "4-5 week history of pain in the posterior aspect of [Plaintiff's] knee. This started following an injury at work when she got her foot wedged between two boxes of fabric, twisting her knee." On physical examination of Plaintiff, Dr. Bensen noted abnormal findings of a mildly antalgic gait on the left side, some crepitance in her knee, moderate medial joint line tenderness, a positive McMurray's test, and a grade IA Lachman. Dr. Benson opined that Plaintiff's symptoms were caused by her injury at work assuming Plaintiff's report of events were credible.
10. On September 13, 2005, Defendants filed a Form 61 Denial ofWorkers' Compensation Claim indicating that the basis of denial was Plaintiff's not returning a signed medical authorization sheet and medical records from all treating physicians." This Form 61 was signed by Defendant-Carrier's claims adjuster. However, Plaintiff did not receive any medical authorization from Defendants before this denial, and she did not receive a copy of the Form 61.
11. On October 21, 2005, Defendants filed another Form 61 indicating that the basis of denial was Plaintiff's not returning a signed medical authorization. This Form 61 was unsigned. However, there is no evidence that Plaintiff received any medical authorizations from Defendants before this time.
12. Defendant-Employer disciplined Plaintiff because of absences at work around November 17, 2005. On that date, Ms. Jones issued a "Corrective Action Form" that cited Plaintiff for unacceptable levels of productivity and attendance since January 2005. However, *Page 8 
the Corrective Action Form indicated that some of Plaintiff's absences were due to a "medical condition out of my control — injury in warehouse." Furthermore, Ms. Jones subsequently completed a Form 22 Wage Chart and Attendance Record using information from Defendant-Employer's computerized monthly business report, which indicated that Plaintiff had not missed any days from work in the fifty-two weeks preceding July 14, 2005.
13. Plaintiff also saw Dr. Scott Smith, M.D., who is an orthopedic surgeon who practiced with Dr. Bensen. Dr. Smith opined to a reasonable degree of medical certainty based upon Plaintiff's credible report of history, that Plaintiff's injury at work aggravated her underlying degenerative condition. Dr Smith and Dr. Bensen did not believe, however, that Plaintiff needed surgery. On November 29, 2005, Dr. Bensen took Plaintiff completely out of work because of the ongoing symptoms in her left knee.
14. On December 19, 2005, Dr. Smith restricted Plaintiff to sedentary work only with no walking more than fifteen minutes per hour and no bending, stooping, squatting, or kneeling, and no climbing ladders or stairs. Any violation of these restrictions placed Plaintiff at an increased risk of aggravating or worsening her knee condition.
15. Plaintiff worked during all periods in which her doctors allowed her to work. Both before and after May 1, 2006, Plaintiff continued to have the medical restrictions given to her by Dr. Smith and Dr. Bensen. She continued to work at Defendant-Employer through May 1, 2006, even though her normal work activities exceeded those restrictions.
16. In early 2006, Plaintiff voluntarily left Defendant-Employer's Charlotte location and moved to Charleston, South Carolina, to remarry. She continued to work for Defendant-Employer in Charleston performing the same type of job until May 1, 2006, when Plaintiff lost her job when the store was bought out and she was not retained as an employee. After the injury *Page 9 
on July 14, 2005, Plaintiff stated she began to shift her weight from her left side to her right side because of her left knee pain.
17. On August 24, 2006, Plaintiff first saw Dr. Harold Del Schutte, M.D. for her knee pain. Dr. Schutte is a medical professor and Director of the Adult Joint Reconstructive Program at the Medical University of South Carolina in Charleston, South Carolina. Dr. Schutte's first medical record indicated that Plaintiff had had left knee pain since an injury at work in Charlotte, North Carolina, about a year prior to that appointment. Plaintiff's problems at that appointment included ongoing locking and catching, which are mechanical problems, and Dr. Schutte suspected a meniscal tear. X-rays ordered by Dr. Schutte showed joint effusion and degenerative changes in the form of joint space narrowing or thinning of the cartilage in Plaintiff's left knee. Dr. Schutte performed arthroscopic surgery on Plaintiff's left knee on September 7, 2006. Dr. Schutte opined to a reasonable degree of medical certainty that Plaintiff's left knee condition was due to a work-related accident on July 14, 2005, or an aggravation of an underlying degenerative condition by the work-related accident on July 14, 2005.
18. Based upon the totality of the evidence of record, the Full Commission finds that Plaintiff has shown that her left knee condition is caudally related to the work-related accident on July 14, 2005, which either caused her underlying pathology entirely or aggravated pre-existing pathology to the extent it became symptomatic.
19. Between May 1, 2006, and December 28, 2006, Plaintiff received unemployment compensation while in South Carolina, based upon her employment in Charleston, and looked for other work. She satisfied all of the job search requirements under the law for purposes of receiving unemployment compensation, but did not get hired. Plaintiff was capable of some work between May 1, 2006, and December 28, 2006, and made a reasonable effort to find other *Page 10 
work during this period, but without success. On December 28, 2006, Plaintiff returned to work in Charleston, South Carolina.
20. Plaintiff's left knee has continued to hurt since September 2006. Several weeks before May 2007, Plaintiff's right knee started to hurt more. By May 9, 2007, Plaintiff had twisted her right knee and felt a pop. Several days later, her knee popped again when her knee gave way while she was getting into her car.
21. Dr. Schutte would not link Plaintiff's right knee problems to her original left knee injury to more than a possible degree. Based upon a review of the record in this matter, the Full Commission finds that the greater weight of the evidence does not show that Plaintiff's overcompensation of her left side more than likely caused, contributed to, or aggravated the underlying pathology in Plaintiff's right knee to the point that her right knee became symptomatic.
22. Plaintiff continues to have swelling and pain in her left knee, and she takes pain medication on occasion. Despite these problems, Plaintiff had continued to remain gainfully employed and kept working as of the date of hearing before the Deputy Commissioner, except for the periods mentioned elsewhere in these findings of fact.
23. Although Plaintiff preferred to not have any more surgeries, Dr. Schutte stated that Plaintiff is at a greater than fifty percent chance of needing both of her knees replaced in the future because of the symptoms related to her pathology.
24. Plaintiff was paid on a draw-plus-commission basis with Defendant-Employer. However, the terms of her employment with Defendant-Employer indicated that once she was paid either a draw or commission, Defendant-Employer could not recoup the payments, but could only terminate Plaintiff's employment as its recourse for insufficient commissions. *Page 11 
Plaintiff had to pay both federal and state taxes on all payments she received, and Defendant-Employer reported the full amount of these payments to both federal and state tax authorities on Plaintiff's W-2 forms. Although Plaintiff was paid on a draw-plus-commission basis, against which any deficit in commissions was applied against future commissions, it is too speculative and impossible to determine the exact work weeks in which Plaintiff actually earned her commissions.
25. In 2004, Plaintiff earned $42,672.60 while working at Defendant-Employer, according to Plaintiff's W-2 form with Defendant-Employer. In 2005, Plaintiff earned $34,975.43 while working at Defendant-Employer, according to Plaintiff's W-2 form with Defendant-Employer. In both of these years, Plaintiff earned a total of $77,648.03.
26. Plaintiff's tax records are the most reliable indicator of her earnings with Defendant-Employer. Using these records are fair and just to both parties, since both Plaintiff and Defendant-Employer are obliged to report accurately the amount of Plaintiff's earnings to both federal and state tax authorities in their tax filings, including Plaintiff's W-2 forms. Dividing $77,638.03 by 705 days [multiplying 365 days by 2 years and then deducting the twenty-five days missed between (1) August 3 and August 7, 2005, and (2) November 29 and December 19, 2005] and then multiplying the result by seven days produces a figure of $770.97, which the Full Commission finds to be Plaintiff's average weekly wage.
27. Plaintiff is not yet at maximum medical improvement for her injuries.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 12 
1. Plaintiff sustained a compensable injury by accident to her left knee arising out of and in the course of her employment on July 14, 2005. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to all medical compensation related to her left knee compensable injury, including the treatment provided and recommended by Dr. Armistead, Dr. Garcia, Dr. Bensen, Dr. Smith, and Dr. Schutte. N.C. Gen. Stat. §§ 97-2(19), 97-25. Dr. Schutte is authorized to treat Plaintiff for her compensable injuries.
3. Defendants must notify Plaintiff's group health insurance Carriers and Plaintiff's medical providers of this determination of compensability and liability. See
N.C. Gen. Stat. § 97-90.1. Defendants must either (1) reimburse these group health carriers and Plaintiff for their expenses related to Plaintiff's injuries, or (2) pay Plaintiff's medical providers according to the Industrial Commission's fee schedule so that Plaintiff's medical providers can refund any payments to her group health Carriers and to Plaintiff. However, Defendants shall hold Plaintiff harmless against any efforts by her group health insurance carriers to seek reimbursement or credit for any of Plaintiff's injury-related treatment. N.C. Gen. Stat. §§ 97-25, 97-90.1.
4. Plaintiff was totally disabled because of her injury for the four days between August 3, 2005, and August 7, 2005. N.C. Gen. Stat. § 97-29.
5. Plaintiff was totally disabled because of her injury for the twenty-one days between November 29, 2005, and December 19, 2005. N.C. Gen. Stat. § 97-29.
6. Plaintiff was totally disabled because of her injury for the 241 days between May 1, 2006, and December 28, 2006. N.C. Gen. Stat. § 97-29.
7. Plaintiff's average weekly wage has been calculated correctly under the fifth method in N.C. Gen. Stat. § 97-2(5). *Page 13 
8. The issue of permanent partial disability under N.C. Gen. Stat. § 97-31, assuming that this is the more favorable remedy to Plaintiff, is premature until she reaches maximum medical improvement. See Knight v. Wal-Mart Stores,Inc., 149 N.C. 1, 562 S.E.2d 434 (2002), aff'd,357 N.C. 44, 577 S.E.2d 620 (2003) (per curiam).
9. Defendants are entitled to a credit for any unemployment benefits Plaintiff received during the periods of time in which the Commission has awarded indemnity benefits to Plaintiff. N.C. Gen. Stat. § 97-42.1.
 ***********
The foregoing Stipulations, Findings of Fact, and Conclusions of Law engender the following:
 AWARD
1. Subject to the attorneys' fee provided below, Defendants shall pay total disability compensation to Plaintiff for a total of 241 days based on an average weekly wage of $770.97, for a total of $17,695.60 [($770.97 x 2/3) x (241 days / 7 days)].
2. Defendants shall authorize and pay for all injury-related medical compensation for Plaintiff's left knee, including all future treatment recommended by Dr. Schutte.
3. Plaintiff's counsel is entitled to a reasonable attorneys' fee of twenty-five percent (25%) of all compensation awarded in this Opinion and Award. Defendants shall forward all sums due under this Opinion and Award to Plaintiff's counsel for appropriate disbursement.
4. Defendants shall receive a credit for any unemployment benefits Plaintiff received during the periods of time in which the Commission has awarded indemnity benefits to Plaintiff.
5. Defendants shall pay the costs.
This 10th day of March 2010. *Page 14 
 S/__________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/__________ STACI T. MEYER COMMISSIONER
 S/__________ DANNY LEE McDONALD COMMISSIONER *Page 1